James R. HOFFA et al., Plaintiffs,

v.

William B. SAXBE, Defendant.

Civ. A. No. 74-424.

United States District Court,
District of Columbia.
Civil Division.

July 19, 1974.

Leonard B. Boudin, Michael Krinsky, Eric M. Lieberman, New York City, David Rosenberg, Cambridge, Mass., David Rein, Washington, D. C., for plaintiffs.

Michael A. Katz, Asst. U. S. Atty., Washington, D. C., for defendant.

## OPINION

JOHN H. PRATT, District Judge.

This is a suit by plaintiff,[1] James R. Hoffa, to set aside as invalid the condition or restriction attached to the commutation of sentence granted on December 23, 1971, by the President. As a result of this commutation, plaintiff's sentence was reduced to 6½ years and he was released from prison on December 23, 1971. The matter came before us on plaintiff's motion for summary judgment and defendant's motions to dismiss or alternatively for summary judgment.

### 1. *The Facts*

On March 7, 1967, plaintiff entered the Federal Penitentiary at Lewisburg, Pennsylvania, and commenced serving an aggregate sentence of thirteen years imposed as the result of two convictions for felonies. Previously, on March 4, 1964, plaintiff had been convicted before the United States District Court for the Eastern District of Tennessee of two counts of obstruction of justice in violation of 18 U.S.C. § 1503, under an indictment charging jury tampering. On March 12, 1964, he received sentences of four years on each count, the sentences to run consecutively. In August, 1964, plaintiff had been convicted before the United States District Court for the Northern District of Illinois, on four counts charging violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, and of conspiracy to defraud in violation of 18 U.S.C. § 371, with respect to a scheme to defraud a Teamsters Pension Fund. For this conviction he received sentences of five years on each count, to be served concurrently but consecutive to the eight year term earlier imposed. Both of these convictions were eventually affirmed on appeal. United States v. Hoffa, 437 F.2d 11 (6th Cir. 1971), cert. denied, 402 U.S. 988, 91 S.Ct. 1664, 29 L.Ed.2d 154 (1971); United States v. Hoffa, 436 F.2d 1243 (7th Cir. 1970), cert. denied, 400 U.S. 1000, 91 S.Ct. 455, 27 L.Ed.2d 451 (1971).

The thirteen-year sentence would have expired on March 6, 1980. As computed by the Bureau of Prisons in accordance with 18 U.S.C. § 4161, plaintiff would have been eligible for mandatory release on November 28, 1975 through the deduction of statutory good time from the full thirteen-year sentence.

In November, 1969, plaintiff applied for and was denied parole, his application being put over for eighteen months. On March 31, 1971, plaintiff was again denied parole by the Board of Parole sitting *en banc*. In June, 1971, plaintiff, who had continued to serve as President of the International Brotherhood of Teamsters while incarcerated, resigned from said position and all affiliated organizations. In July, 1971, he did not seek election to union office at the annual convention of the Teamsters. Following plaintiff's change of status, the

---

1. Certain individuals and locals affiliated with the International Brotherhood of Teamsters are also named as plaintiffs but for the sake of convenience will not be further referred to in this Opinion with the exception of note 63, *infra*.

Board of Parole granted a rehearing of plaintiff's application but on August 20, 1971 again denied said application, deferring further consideration until June, 1972.

On or about December 13, 1971, plaintiff, acting through his then counsel, filed two petitions for commutation addressed to the President of the United States asking that he be granted commutation of each of the sentences resulting from the previously described convictions. In each of said petitions for commutation, plaintiff, after setting forth the history of his previous applications for parole and his resignation from all union offices, made the following representation:

"Your petitioner does not have routine problems usually faced by persons released from prison for the reason that he has a home, a devoted family, ties in the community, and adequate assurances of a continuing livelihood. Your petitioner would be supported by and live on a pension to which he is entitled for his previous years of service to the Teamster's Union. Further, your petitioner, if he is granted a commutation of sentence, intends to enter the educational field on a limited basis as a teacher, lecturer or educator, as may be approved by your Excellency."

The petitions for commutation were received by Lawrence Traylor, the Pardon Attorney of the Department of Justice, pursuant to 28 C.F.R. § 0.35. Thereafter and prior to December 23, 1971, the Pardon Attorney prepared a recommendation that plaintiff's application for commutation be granted and forwarded said recommendation in the form of a "Letter of Advice" to the President for the Attorney General's signature. The recommendation for commutation prepared by the Pardon Attorney did not contain any condition or restriction upon plaintiff's activities

when released. Upon receipt of the Letter of Advice from the Pardon Attorney, the Attorney General executed it and forwarded it to the White House. In recommending the commutation of plaintiff's sentence, the Letter of Advice from the Attorney General did not recommend that any condition be included or that there by any restriction on plaintiff's right to hold union office or engage in union activities. The Letter of Advice reached John Dean, counsel to the President, whose jurisdiction extended to such matters. Mr. Dean initiated the matter of the condition in a discussion with the Attorney General but the facts are in dispute as to whether this discussion took place before or after the receipt of the Letter of Advice. In any event, Dean, after consultation with Traylor, sent the Attorney General a legal memorandum on the subject of the condition. Later, on or about December 23, 1971, Dean instructed Traylor to prepare a new warrant commuting plaintiff's sentences and further containing the condition which is the subject of this litigation. This warrant, together with a covering memorandum, was submitted by Dean to the President, who on December 23, 1971, executed the warrant as submitted. The Letter of Advice from the Attorney General never reached the President. The warrant,

"commuted the combined consecutive sentences of the said James R. Hoffa, also known as James Riddle Hoffa, to a term of six and one-half years' imprisonment upon the condition that the said James R. Hoffa not engage in direct or indirect management of any labor organization prior to March sixth, 1980 * * * "[2]

On December 23, 1971, at 4:10 p. m., plaintiff was released from Lewisburg after signing a mandatory release certificate. The evidence is in dispute as to whether plaintiff had knowledge of the condition before or at the time of his re-

2. Individual Warrant of Executive Clemency for James R. Hoffa, December 23, 1971. The condition restricting Hoffa's participa-

tion in union management is hereinafter referred to as the "condition."

lease. He has admitted that he heard about it over the media that evening in St. Louis. Furthermore, on December 27, 1971, he was formally advised of it and given a copy of its text by the Chief Probation Officer for the Eastern District of Michigan. The individual warrant of conditional commutation was delivered to plaintiff by certified mail on January 11, 1972, which plaintiff failed to acknowledge.

Through the period from December 23, 1971, when he was released from prison, to the present, plaintiff has abided by the condition of his commutation. On March 10, 1973, the standard conditions of parole applicable to plaintiff's mandatory release on December 23, 1971, expired. On February 5, 1974, plaintiff filed a formal application with the Attorney General requesting removal of the condition. Believing that relief was not imminent, this suit was filed on March 13, 1974.

### 2. The Issues.

Under Article II, Section 2, Clause One of the Constitution the President has the "Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." The instant case challenges the exercise of that power in granting plaintiff Hoffa's conditional commutation, and alleges that the condition prohibiting Hoffa from participating in union management until 1980 unlawfully infringes on his First Amendment rights of speech and association, amounts to additional punishment and a bill of attainder as well as contravening the double jeopardy clause, all in violation of the Fifth Amendment, and contends that the condition was imposed outside the normal pardon application procedures, without due process of law, and in spite of the fact that Mr. Hoffa never "accepted" the condition. Plaintiff further alleges that the condition was formulated and imposed as the result of a conspiracy involving the President, one of his advisors, Mr. Colson, the president of the In-

ternational Brotherhood of Teamsters, Mr. Fitzsimmons, and unknown others.

Plaintiff has moved for summary judgment on all issues except for the conspiracy allegation. On the latter issue, plaintiff contends that he has a right to full discovery and a trial of the factual questions raised thereby. Defendant, however, in moving to dismiss, or, in the alternative, for summary judgment, argues that the Court lacks jurisdiction to inquire into the rationale or motivations for the President's decision. The Court agrees that the matters raised by plaintiff's conspiracy charge are irrelevant to the validity *vel non* of the conditional commutation. We hold that the President may exercise his discretion under the Reprieves and Pardons Clause for whatever reason he deems appropriate and it is not for the courts to inquire into the rationale of his decision. See Ex parte Grossman, 267 U.S. 87, 45 S.Ct. 332, 69 L.Ed. 527 (1925). If, as the plaintiff specifically claims, the President participated in the alleged conspiracy, it necessarily follows that the President was also fully aware of the considerations motivating the final decision to commute Hoffa's sentence. There is no claim that the President was in any way deceived or misled into acting upon Hoffa's application for clemency. Plaintiff essentially charges that the President acted, at least in part, with a view toward gaining political advantage. But this fact alone, even if proven, would never be enough to vitiate an otherwise proper exercise of Constitutional power for the same reason that one cannot attack the validity of an Act of Congress on the grounds that the Congressmen who voted in favor of it did so for improper motives. The Court, therefore, grants defendant's motion to dismiss plaintiff's allegation of unlawful conspiracy.

In addressing the broader issues raised by plaintiff's complaint, admittedly ripe for summary judgment, it is necessary to briefly consider the histori-

cal background against which the framers of our Constitution decided to repose the pardoning power solely with the executive branch of government. In order to narrow this discussion to the issues presented, we will consider the English and colonial experiences only insofar as they illuminate the general scope of the pardoning power as it was understood and created in 1787 at the Philadelphia Convention, with a particular view toward the imposition of conditions in connection with the exercise of that power. As will become clear during the course of this analysis, the power to attach conditions has long been recognized as inherent in the pardoning power itself. The essential question for the case at bar thus becomes whether the particular condition involved here is within that general understanding and not otherwise contrary to the Constitution.

3. *The Adoption by the Constitutional Convention of 1787 of the Pardons and Reprieves Clause.*

A. *The English and colonial precedents.*

By the time of our Constitutional Convention of 1787, the framers could draw upon their knowledge of English practice as well as their more immediate experience with colonial charters in devising the structure and form of our national government.[3] In the first Supreme Court opinion which considered the President's pardoning power, Chief Justice Marshall explicitly recognized the importance of English practice in interpreting the scope of that power:

"As this power had been exercised, from time immemorial by the execu-

tive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance; we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it." (United States v. Wilson, 32 U.S. (7 Pet.) 150, 160, 8 L.Ed. 640).

In order properly to interpret the nature and extent of the king's pardoning prerogative, it is appropriate to trace the development of that authority within the context of the historical setting of the power struggles, first among the King, nobles and the Church, and subsequently between the King and Parliament, which took place in England during at least the ten centuries immediately preceding our Convention. According to one authority, the pardon prerogative was clearly established in English practice as early as the seventh century but it was also clear that numerous authorities, in addition to the King, claimed the right to exercise it, including the Church, various members of the nobility, and the feudal courts.[4] As another source has put it, "[t]he privilege of pardon was a question of power, not yet a problem of law."[5]

The Norman Conquest of 1066 brought with it, through William the Conqueror, "the view that clemency was an exclusive privilege of the king."[6] But by the 14th century Parliament was strongly contending for supremacy through attempts to curtail royal power, including the power to pardon.[7] With

---

3. Humbert, The Pardoning Power of the President, 14–15 (1941).

4. S. Grupp, Some Historical Aspects of the Pardon in England, 7 Am.J. of Legal History 51, 55 (1963). See also Humbert, *Pardoning Power, supra* note 3, at 9–10. It is impossible to be precise about the pre-Conquest legal history of England because as Maitland has pointed out "how much law there was common to the whole kingdom in the days before the Norman Conquest is a very difficult question." F.

W. Maitland, The Constitutional History of England at 3 (Fisher ed. 1908). Some theorists divided pre-Conquest English law into three branches: the West-Saxon, the Mercion and the Danish. *Id.*

5. Attorney General's Survey of Release Procedures, Vol. III: Pardon, 27 (1939).

6. C. Jensen, The Pardoning Power in the American States, 1 (1922).

7. See, e. g., 13 Rich. II, st. 2, ch. 1 (1389) which provided that no pardon for treason,

the rise of the Tudors, however, and in particular Henry VIII, Parliament succumbed in the struggle and the power to pardon was lodged solely in the King with the enactment of 27 Henry VIII, ch. 24 in 1535.[8]

After having recognized the King's pardon prerogative as "exclusive," [9] Parliament, slowly evolving as the supreme political power of England, began a process of limiting the King's prerogative in certain particulars. By the time of our Constitutional Convention, Parliament's supremacy was clearly demonstrated by three important limitations on the King's pardoning power: (1) the Habeas Corpus Act [10] which forbade clemency to persons who imprisoned English citizens "beyond the realm"; (2) the Bill of Rights [11] which prohibited the King from granting "dispensations," i. e., suspending or disregarding a given law in particular cases; and (3) the Act of Settlement [12] prohibiting the use of pardon in cases of impeachment. Moreover, by 1721, Parliament asserted its own right to pardon, thus symbolizing, perhaps, that the balance of political power in England had tipped irretrivably in favor of Parliament.[13]

We have traced this historical process to emphasize one essential point. The British system of government, unlike ours, has never been governed by a written constitution. Over the centuries Parliament slowly encroached upon the powers of the King until at some point Parliament became unequivocally supreme. The history of the King's pardoning prerogative is but a microcosm of that general process. As plaintiff rightfully points out, the King's inherent power to pardon was, by the time of our Constitutional Convention, clearly circumscribed by Parliament but always by specific legislative proscription directed at enumerated exercises of that power. It was implicitly understood that unless specifically limited, the King's power was plenary and without restriction.

In theory, the King, as sovereign, could forgive all offenses against the

---

murder, or rape should be granted, unless the offense was particularly specified by the terms of the pardon. In the case of murder, the pardon had to specify whether it was committed by lying in wait, assault, or with malice. The statute was apparently intended to make it more embarrassing for the King to grant pardons for the enumerated offenses and perhaps thereby substantially reduced the number of such pardons.

The King, not to be outdone, merely issued such pardons *non obstante* the statute, by virtue of his related power to grant dispensations from the operation of statutes in individual cases. This practice was ended by the English Bill of Rights. See *Attorney General's Survey*, supra note 5, at 29, 135–36.

8. See Grupp, *Historical Aspects*, supra note 4, at 55–56; *Attorney General's Survey*, supra note 5, at 29. The statute was to the effect "that no other person hath power to pardon or remit any treason or felonies whatsoever: but that the king hath the whole and sole power thereof, united and knit to the imperial crown of this realm." Blackstone, Commentaries, Book IV at 397 (Cooley, 4th ed. 1899).

9. Even at this point the King's power was not totally exclusive as the Church-related privileges of "benefit of clergy" and sanctuary were still recognized. See *Attorney General's Survey*, supra note 5, at 35, 37; Grupp, *Historical Aspects*, supra 4, at 57–58. "Benefit of clergy" was not formally abolished until 1827. 7 and 8 Geo. IV, ch. 28 (1827). The practice of sanctuary appears to have been an early precedent for the King's later practice of pardoning felons on the condition of banishment. See p. 1228, *infra*. Grupp notes that "[t]he usual requirement [of permanent sanctuary] seems to have been that the criminal abjure the realm, forfeit all of his goods and submit to a life of banishment. At best this can be regarded as a conditional pardon with permanent conditions." *Id.*

10. 31 Car. II, ch. 2 (1679).

11. 1 Wm. & Mary, sess. II, ch. 2 (1689).

12. 12 and 13 Wm. III, ch. 2 (1701).

13. 7 Geo. I, ch. 29 (1720). Parliament even went so far as to make its own pardon "judicially noticeable" whereas the King's pardon was still regarded as a private act which had to be pleaded by its recipient. *Attorney General's Survey*, supra note 5, at 29.

crown.[14] In an age where indeterminate sentences and parole boards were unknown, the King's pardon was the "last and surest resort," [15] of the convict in attempting to have the nature or extent of his punishment mitigated. Indeed, the King's pardon was the sole device for altering punishment according to "the situation and circumstances of the offender." [16] As such the royal pardoning power was in fact a predecessor of the modern criminal justice devices of probation and parole.[17]

At the time our Constitution was adopted in 1787, the King's pardon was an integral part of the English system of criminal justice. It is not surprising, therefore, that conditional pardons were also a part of that system. Blackstone points out that

> "the king may extend his mercy upon what terms he pleases; and may annex to his bounty a condition either precedent or subsequent, on performance whereof the validity of the pardon will depend; and this by the common law." [18]

Plaintiff argues, however, that the history of English practice demonstrates that Blackstone's characterization of the power was overbroad and contends that the King's power was inherently limited to the imposition of conditions which had been previously authorized by Parliament. No express authority is cited for this proposition but rather plaintiff apparently believes that this limitation was implicit in the actual exercise of the King's power. By way of example, plaintiff contends that the commonly used condition of banishment to the English colonies[19] has as its bases the so-called Piracy Act of 1717.[20]

Plaintiff's claim is somewhat wide of the mark. Parliament had in fact imposed the punishment of banishment as early as the 16th century for rogues and vagabonds who appeared to be dangerous.[21] Throughout the 17th century Parliament enacted other statutes which imposed banishment for other specified crimes.[22] "But *at the same time* a practice sprang up which was applied to *all* felons under sentence of death. They could petition the King for a pardon on condition of their agreeing to transport themselves to the colonies

14. Blackstone remarked,
"This is indeed one of the great advantages of monarchy in general, above any other form of government; that there is a magistrate who has it in his power to extend mercy, wherever he thinks it is deserved: holding a court of equity in his own breast, to soften the rigour of the general law, in such criminal cases as merit an exemption from punishment." Blackstone, *Commentaries, supra* note 8, at 397.

15. *Id.* at 396.

16. *Id.* at 397.

17. C. L. Newman, Sourcebook on Probation, Parole and Pardons, chs. 1 and 2 (3rd ed. 1968).

18. Blackstone, *Commentaries, supra* note 8, at 401. See also Hawkins, *Pleas of the Crown*, Vol. II, ch. 37, at 547 (Curwood, 8th ed. 1824). The Supreme Court adopted Blackstone's language in Ex parte Wells, 59 U.S. 307, 311, 15 L.Ed. 421 (1856).

19. The King would grant a pardon upon the condition that the convict would permanently, or for some specified period, remove himself to one of the colonies; at first this

usually meant one of the American colonies. Plaintiff makes much of the fact that this type of conditional pardon was usually applied to convicts under a death sentence. The attempted distinction ignores the fact that practically all felonies were punishable by death at that time. See J. F. Stephen, History of the Criminal Law of England, Vol. I, at 458, 469–72 (1883).

20. 4 Geo. I, ch. 11 (1717). The condition of banishment has been chosen by plaintiff apparently because of its wide-spread use and more importantly because of its possible analogy to the condition in question here. It appears logical that if the condition of banishment sprang from the inherent authority of the King to pardon, then the condition imposed here might also arise from that power. In order to avoid this result, plaintiff has argued that the King did not have it within his power to attach the banishment condition until such time as Parliament expressly approved.

21. 39 Eliz. I, ch. 4 (1597).

22. E. g., 14 Car. II, ch. 1 (1662); 18 Car. II, ch. 3 (1666); 22 Car. II, ch. 5 (1670); 22 and 23 Car. II, ch. 7 (1670).

either for life or for a specified term."[23] It was only later, when certain procedural and enforcement problems arose,[24] that Parliament enacted the Piracy Act. This act expedited the procedures for obtaining such a conditional pardon and expressly made the recipient of the pardon liable to the death penalty in the event he returned to England prematurely.

The point to be emphasized is that it was the King who first initiated banishment as a condition to his pardon. The power of the King to grant such a condition to any felon, even where banishment was not a punishment authorized by law for the felon's crime, was inherent in the royal prerogative and was never questioned.[25] It is true in all probability that by the 18th century Parliament had ascended to such a position of permanent power that it could have, if it so desired, forbidden the crown from conditioning pardons in this manner. But as with all similar parliamentary limitations on the King's prerogative, the restriction would have said nothing about the inherent nature and scope of the power. As we have emphasized above, and as our courts have noted,[26] the pardoning power at base is inherently unfettered except by the integrity of the repository of the power. The power's very origin and inception as something above and beyond the normal workings, restrictions and limitations of the criminal justice system fully supports this understanding.[27]

Only one limitation on the King's prerogative might be considered inherent to the pardoning power itself. The King, as sovereign, could forgive any offense against the crown but could not absolve a subject's liability to another party because to do so would be to extinguish the personal rights of a private suitor. As Blackstone put it, the King had no power to pardon "where private justice is principally concerned" under the doctrine of *"non potest rex gratiam facere cum injuria et damno aliorum"* (the king cannot confer a favour by the injury and loss of others)[28]

From this rather limited (and logical) principle of the English common law, the plaintiff concludes that "vested rights could not be destroyed by the pardon power."[29] In support of his position, he quotes the following passage from Hawkins' Pleas of the Crown:

"I take it to be a settled rule, that the king cannot by any dispensation, re-

---

23. P. Brett, Conditional Pardons and the Commutation of Death Sentences, 20 Modern Law Review 131, 134 (1957). (Emphasis added). See also *Attorney General's Survey, supra* note 5, at 197; Stephen, Criminal Law, *supra* note 19, at 471.

24. It was apparently a rather cumbersome procedure to obtain the King's pardon and thus the convict's sentence might be executed before the pardon was forthcoming. In addition, the courts were unsure of how to deal with the pardoned convict when he didn't live up to his condition. Brett, *id.* at 134–35.

25. Another example of a condition which was often utilized by the King despite its not being a punishment authorized by Parliament was the requirement of military service. It was customary, in time of war, for the King to grant pardons on the condition that the recipient serve a year in the military. Grupp, *Historical Aspects, supra* note 4, at 58.

26. *See* Ex parte Garland, 71 U.S. (4 Wall.) 333, 380, 18 L.Ed. 366 (1866); Schick v.

Reed, 157 U.S.App.D.C. 263, 483 F.2d 1266, 1268 (1973), cert. granted, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974); Bishop v. United States, 96 U.S.App.D.C. 117, 223 F.2d 582, 588 (1955).

27. It is interesting to note that most state courts have found that a pardon conditioned on banishment is an inherent part of the Governor's general pardoning authority. See Note "Banishment as condition of pardon," 31 Minn.L.Rev. 742 (1946). For a recent case on this point see Mansell v. Turner, 384 P.2d 394 (Utah 1963). The roots of the clemency power as exercised in the states are the same of course as those of the President's clemency authority.

28. Blackstone, *Commentaries, supra* note 8, at 398–99.

29. See Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss or in the Alternative for Summary Judgment and for Summary Judgment (hereinafter Plaintiffs' Memorandum) at 35.

lease, pardon or grant whatsoever, bar any right, whether of entry, or action, or any legal interest, benefit, or advantage whatsoever before vested in the subject; and upon this ground it seems clear, that the king can no way bar any action on a statute by the party grieved; nor even a popular action by a common informer, if commenced before his pardon or release; and that he cannot discharge a recognizance for the peace before it is forfeited."[30]

As can be readily gleaned from the passage, the author is enunciating the same principle of law noted by Blackstone—that the King's pardoning power could not destroy the vested rights of third parties who otherwise have a civil cause of action against the person pardoned.

The case of United States v. Lancaster, 26 Fed.Cas. 859, 4 Wash.C.C. 64 (Cir.Ct., E.D.Pa.1821), plaintiff's only other authority for the proposition that a condition attached to a pardon cannot impinge on "vested rights," in fact precisely illustrates the true nature of the limitation on the King's pardoning power. Because of a violation of one of the embargo laws of that time, Lancaster's brig "Eliza" was seized and his bond, apparently required to ensure his faithful adherence to the embargo laws, was forfeited. After petitioning for a pardon, the President remitted "all the rights and interest of the United States."[31] The question arose, however, whether the presidential pardon barred the collector and other officers of the customs district where the forfeiture was executed from collecting their share of the bond proceeds. It was in the con-

text of this issue, i. e., whether the President's pardon could "effect the moiety of the penalty claimed by the officers of the customs," that the Court made the statement partially quoted in plaintiff's memorandum,

"According to the doctrine of the common law of England, the king cannot, in the exercise of his prerogative of pardon, defeat a legal interest or benefit vested in a subject. . . ." 26 Fed.Cas. at 860.[32]

The "subject" referred to is, of course, intended to mean a third party with a separate right of action against the pardoned offender. In sum, the principle in no way purports to limit the ability of the King, or in *Lancaster*, the President, to attach conditions to grants of clemency.

We conclude, as we must, that this limitation on the King's power has no application to the case at bar. Properly viewed, the principle merely states the non-applicability of the power to a subject matter historically outside of the scope of the pardoning power, namely, private causes of action. It says nothing about the King's power to impose conditions upon pardons and commutations of *criminal* offenses. As such, it is perfectly consistent with the Court's finding that the King's pardoning power, when applied within the sphere of criminal offenses only, was inherently unfettered, except where the exercise of that power was specifically limited by act of Parliament.

B. *The President's Grant of Authority Under the Federal Constitution.*

■■ With the background of English precedent and state practice[33] readi-

---

30. Hawkins, Pleas of the Crown, supra note 18, at 543–44.

31. 26 Fed.Cas. at 860.

32. The Court avoided answering the question by holding that the terms of the pardon itself did not encompass the claims of the customs officials and that "no pardon shall be carried beyond the express purport of it." *Id.* at 861.

33. Most of the colonial charters contained a provision delegating the King's pardoning power to the executive authority of the colony. Jensen, Pardoning Power in the States, *supra* note 6, at 4. After the outbreak of the Revolution, the colonial governments were succeeded by state governments and consequently, for the first time in America's history, a conscious decision had to be made regarding the proper repository of the im-

ly at hand, the Founding Fathers devoted little attention to the question of the pardoning power. That the power should be lodged solely with the chief executive of the new nation raised sparse debate.[34] Similarly, the substantive extent of the power was scarcely questioned, except that it was readily agreed that the pardoning power should not apply to impeachments.[35] This paucity of discussion led the Supreme Court to conclude, after noting that the King's pardoning authority had, by the date of our Convention, been "clearly circumscribed," that

> "[t]he framers of our Constitution had in mind *no necessity* for curtailing this feature of the King's prerogative in transplanting it into the American governmental structures save by excepting cases of impeachment. . . ." (Ex parte Grossman, 267 U.S. 87, 113, 45 S.Ct. 332, 334, 69 L.Ed. 527 (1925)). (Emphasis added).

It would appear abundantly clear that the framers intended to repose with the President the fullest extent of that authority which the words "reprieves and pardons" have historically encompassed. The framers were concededly aware of the various limitations which had been imposed on the King's prerogative by Parliament, as well as the limitation imposed by the state constitutions, but deliberately chose to limit the President's authority in one particular only,[36] *viz.,* in cases of impeachment. We start then not with a narrowly defined and circumscribed power but with the full power of the sovereign, i. e., under our system of government, the full power of the People, to pardon those who have perpetrated offenses against it. This is not to say that the power is limitless. The President, who exercises that power as the elected representative of all the People, must always exercise it in the public interest. And the power is most importantly limited, as are all powers conferred by the Constitution, by the Bill of Rights which expressly reserved to the "individual" certain fundamental rights. Within this framework, we turn now to an examination of the case law interpreting the President's pardoning power and apply those cases, as well as the foregoing principles, to the case, at hand.

### 4. The Exercise of the Power to Pardon as Shown by Applicable Case Law.

Generally the cases have uniformly supported a very broad interpretation of the President's pardoning authority. Both the Federal and state cases have

---

portant pardoning power. Because of the prevailing distrust of the executive power, many state constitutions, while placing the power in the hands of the governor, limited his discretion by requiring the consent of so-called executive councils, made up of upper-house legislators. *Id.* at 10.

34. By the time of our national Constitutional Convention, public opinion had apparently moved in the direction of placing the pardoning authority solely in the hands of the executive. See *Attorney General's Survey, supra* note 5, at 89. There was a proposal by Roger Sherman that would have required the Senate's consent to a presidential pardon, but the motion was soundly defeated. See Humbert, *Pardoning Power, supra* note 3, at 15–16. See also The Federalist No. 74, at 496–99 (Ford ed. 1898) where Hamilton presents the argument against giving the legislature any control over the pardoning power.

35. It was suggested by Edmund Randolph that another exception be made in cases of treason but the proposal was also defeated. See Farrand, The Records of the Federal Convention of 1787, Vol. II, 626–27 (rev. ed. 1937). See also The Federalist No. 68, at 460 (Ford ed. 1898 (A. Hamilton) "The power of the President in respect to pardons would extend to all cases *except those of impeachment.*") (Emphasis in original); J. Kent, Commentaries on American Law, Vol. I, 303 (8th ed. 1854) ("The power of pardon vested in the President is without any limitation except in the single case of impeachments.")

36. In arguing for the adoption of the Constitution, Hamilton remarked:
"Humanity and good policy conspire to dictate that the benign prerogative of pardoning should be as little as possible fettered or embarrassed." The Federalist No. 74, at 497 (Ford ed. 1898).
See also, note 35 *supra.*

practically universally upheld the executive's power to commute as part of the power to pardon.[37] In the first challenge to the substantive breadth of the President's power to reach the Supreme Court, the petitioner argued that the term "pardon" did not include the authority to "commute," i. e., to substitute a lesser punishment for a greater punishment.[38] The Court remarked that,

> "[t]he mistake in the argument is, in considering an incident of the power to pardon the exercise of a new power, instead of its being a part of the power to pardon." (Ex parte Wells, 59 U.S. (18 How.) 307, 316, 15 L.Ed. 421 (1856)).

Thus, from the very first the Court recognized the inherently broad scope of the pardoning power. In further answering petitioner's contention that the President had unlawfully substituted a different punishment,[39] life imprisonment, for the judicially imposed death sentence, the Court offered a rationale very important to the case at bar:

> "The power to offer a condition, without ability to enforce its acceptance, when accepted by the convict, is the substitution *by himself,* of a lesser punishment than the law has imposed upon him, and he cannot complain if the law executes the choice he has made." (*Id.*) (Emphasis added)

The dynamics of a commutation, therefore, essentially involve a *quid pro quo.* The President offers a remission of sentence coupled with a condition; the convict-offeree has the choice of remaining under his judicially imposed sentence or accepting the remission of his sentence and abiding by the condition upon which it was offered. The convict cannot then "complain" of the choice he has made.[40] Presumably it is the convict who has determined that the lesser of the two "punishments"[41] is the one he chooses. In the case of plaintiff Hoffa we as-

---

37. See Note, Executive Clemency in Capital Cases, 39 N.Y.U.L.Rev. 136, 138 (1964); Humbert, Pardoning Power, *supra* note 3, at 22, 46.
 Plaintiff suggests that the fact that the English practice reveals no clemency condition similar to the one imposed in this case is somehow dispositive. No authority is cited for this proposition. Indeed the lack of precedent regarding a similar condition tells us very little about the nature of the pardoning power itself inasmuch as the lack of precedent can just as easily be explained by the fact that the unique circumstances of plaintiff Hoffa's case are unlikely to have ever before presented themselves. In any event we cannot decide the broad issues presented here on the basis of the lack of a similar condition in past practice, for to make lack of precedent a ground for attacking a condition would forever prevent the President from shaping the conditions of his pardon or commutation to meet the precise exigencies of the individual clemency applicant. Such a result would be contrary to the very purpose of the pardoning power.

38. The terms "substituted punishment" and "condition" are used interchangeably since in the context of the present case they refer to the same thing, i. e., the prohibition against union management attached to plaintiff's commutation. The difference in terms arises from the fact that the English practice did not recognize commutation as such,

but the same result was accomplished by way of the conditional pardon. See Brett, Conditional Pardons, *supra* note 23, at 136–37. American jurisprudence, however, has at least since the *Wells* case, explicitly recognized the power to commute as being inherent in the power to pardon.

39. The *Wells* court regarded the punishments as different in kind, therefore necessitating a "substitution" of punishment and not a mere remission. 59 U.S. at 309.

40. The convict's choice is "voluntary" notwithstanding the fact that he was incarcerated. See Ex parte Wells, *supra*, at 315.

41. Plaintiff devotes considerable effort to the proposition that the condition imposed on him was a more severe "punishment" than mere incarceration. He contends that the jail sentence and the condition must be compared by an "objective" standard to determine which is the "lesser punishment." The Court questions whether punishments of differing kind can in any way be objectively measured, notwithstanding the Supreme Court's opinion in Biddle v. Perovich, 274 U.S. 480, 47 S.Ct. 664, 71 L.Ed. 1161 (1927), where the Court held that life imprisonment was by "common understanding" a lesser penalty than death. As plaintiff points out, in some instances, death may well be preferred to life imprisonment. See Plaintiffs' Memorandum at 50, n. 21. See also, Brett, Conditional Pardons, *supra* note

sume, for the sake of argument here,[42] that he has made that choice in favor of the "substituted punishment" offered him by the President.

The condition does not become lawful, however, by virtue of the convict's consent alone. Even though accepted, the condition may not be enforced if beyond the power of the President under Article II, Section 2, Clause One. And although we have found that the President's pardoning power is a broad and flexible one, we have also noted that it does not exist in a vacuum but rather as part of our total constitutional system. Thus we are faced squarely with the crucial issue of this case: whether the condition prohibiting the plaintiff from engaging in the direct or indirect management of union affairs until 1980 is within the President's pardoning power. To answer this question we are faced with the task of articulating a standard against which the condition can be tested, a constitutional standard not before specifically enunciated.

A. *The Proper and Appropriate Test.*

Plaintiff argues that the standard to be applied has been fully set forth by the Supreme Court in Biddle v. Perovich, 274 U.S. 480, 47 S.Ct. 664, 71 L.Ed. 1161 (1927) where, according to plaintiff, Mr. Justice Holmes notes that to be constitutionally valid the "substituted punishment" must be "authorized by law" and inflict less punishment than what the judgment fixed.[43] The *Biddle* case involved a presidential commutation of the petitioner's sentence of death to one of life imprisonment. The case raised the issue of the necessity of the prisoner's acceptance of the life imprisonment condition. The Court ruled that

in death sentence cases the convict's consent to the commutation is unnecessary because the President, in granting the commutation, had in effect determined that execution of the death sentence was not in the public interest and the prisoner "could not have got himself hanged against the Executive order." 274 U.S. at 487, 47 S.Ct. at 665.

In arguing that one criterion for testing the validity of the "substituted punishment" is that it must be "authorized by law," in that Congress must have included the punishment in the legislated penalty for the prisoner's crime, plaintiff relies on a quote from the *Biddle* opinion, which, in its full context, states as follows:

> "The only question is whether the substituted punishment was authorized by law—here, whether the change is within the scope of the words of the Constitution, Article 2, § 2. . . . We cannot doubt that the power extends to this case. * * * The opposite answer would permit the President to decide that justice requires the diminution of a term or a fine without consulting the convict, but would deprive him of the power in the most important cases and require him to permit an execution which he had decided ought not to take place unless the change is agreed to by one who on no sound principle ought to have any voice in what the law should do for the welfare of the whole." (274 U.S. at 487, 47 S.Ct. at 665).

Within this context it is quite clear that the Court was not attempting to enunciate the test suggested by the plaintiff but rather merely restated the fundamental issue before it, i. e., whether the

23, at 144–45. Nevertheless, an objective measurement is only necessary where the convict has no choice in the matter, or in the case of a pure "remission" of sentence. In the case of a commutation, the convict himself determines what is the "lesser" punishment when he chooses either to remain under the judicially imposed sentence or accept the substituted punishment. Presuma-

bly Mr. Hoffa regards living outside the confines of prison under the condition here challenged as less punitive than his former state of incarceration.

42. For the Court's holding with respect to the issue of "acceptance" see Part 5, *infra.*

43. See Plaintiffs' Memorandum at 15.

commutation in question was within the President's power to pardon under the Constitution. Moreover, it has been held that Congress cannot in any way limit the President's authority to pardon.[44] To accept the plaintiff's proposed test would in effect disregard the principle of unfettered executive discretion by imposing on the President the restrictions in penalty imposed by statute on the sentencing court. Such a result would be contrary to the essential concept of the pardoning power, whereby there is placed in the executive a special discretion to mitigate the more precise demands of the criminal law in a manner consistent with the unique requirements of the individual applicant for clemency.[45] In order properly to carry out this function, the President must be afforded the necessary flexibility to respond adequately to the circumstances of each individual clemency request.

Mr. Hoffa's case is an especially apt one to illustrate this necessity. In his petition for clemency Hoffa particularly noted the fact that he had resigned from union office, had the support of a substantial pension, and intended to engage in certain educational pursuits.[46] Conceivably those who considered his petition may have been moved by these facts, as well as other considerations concerning the health of petitioner's wife, and consequently believed that under the circumstances the public interest did not require the further incarceration of Mr. Hoffa.[47] In order to protect the public interest in the activities of an important international union, however, it may well have been concluded that some assurance was necessary to make certain that the applicant, upon obtaining his release because of the circumstances presented in his petition, would not thereafter recommence his union activities, the termination of which had been a crucial factor in securing his release. To obtain such an assurance, the challenged condition may have been deemed a necessary prerequisite; in fact, the concededly unique condition may well have been the only way Hoffa's petition would be approved. To deny the President the flexibility to devise such conditions would result in the unnecessary denial of clemency petitions which might well be favorably acted upon but for the fact that appropriate conditions could not be attached. We think that the history and nature of the pardoning power has always contemplated the type of broad discretion which would permit the repository of the power to devise and attach lawful conditions to its clemency and to offer the same to the clemency applicant.

 Again this is not to say that any condition, even when freely accepted by the prisoner, is by that fact alone legally valid. Considered within the framework of our constitutional system, wherein the rights and liberties of the individual are accorded a position of paramount importance, there are obvious limits beyond which the President may not go in imposing and subsequently enforcing

---

44. Ex parte Garland, *supra;* Schick v. Reed, *supra.*

45. See Part 3–A, *supra;* Ex parte Wells, *supra,* 59 U.S. (18 How.) at 310.
("Without such a power of clemency, to be exercised by some department or functionary of a government, [the State] would be most imperfect and deficient in its political morality, and in that attribute of Deity whose judgments are always tempered with mercy.")

46. See p. 1224, *supra.*

47. Although Hoffa's petition for clemency carefully avoids any express representation concerning his future involvement with union activities, one might understandably be impressed with an implicit representation that, if commuted, he would henceforth refrain from such activities. It is interesting to note that similar concerns did not escape the King's experience,
"it is a general rule that, wherever it may be reasonably presumed the king is deceived, the pardon is void. Therefore, any suppression of truth, or suggestion of falsehood, in a charter of pardon, will vitiate the whole; for the king was misinformed." (Blackstone, Commentaries, *supra* note 8, at 401).

such conditions.[48] On the other hand, every condition which to some degree impinges on those rights and liberties is not thereby unenforceable. Constitutional rights, including those First and Fifth Amendment rights raised by plaintiff, may be restricted provided that the restrictions are precisely drawn to accomplish a legitimate governmental purpose.[49] In judging the reasonableness of the restriction in relationship to the Governmental interest purportedly justifying that restriction, we must look to the circumstances under which the government's authority has been exerted. As the United States Court of Appeals for this Circuit recently remarked in a case involving the denial of certain First Amendment rights:

> "It would be unrealistic to consider [plaintiffs] rights wholly separate and apart from their status as parolees, or to disassociate their status either from the public interest which dictated both their confinement and parole at suitable times, or from reasonable conditions upon which they are released." (Berrigan v. Sigler, No. 73–1563 (D.C. Cir., May 1, 1974) at 14).

Similarly, it would be unrealistic to consider the restriction placed on plaintiff Hoffa's commutation except in the context of his status as a felon twice convicted for activities arising out of his union office and serving a combined sentence of thirteen years imprisonment. This point of reference is significant to the decision of the instant case because Hoffa's "[constitutional] rights of necessity are conditioned by the situation in which [his] convictions placed [him]." *Id.*

At lease one measure of the lawfulness of a condition is that it be reasonable and neither illegal nor against public policy. In Bishop v. United States, 96 U.S.App.D.C. 117, 223 F.2d 582 (1955), the President had commuted the petitioner's death sentence to life imprisonment with the further condition that the life term be measured, for the purposes of parole eligibility, from the date of commutation and not from the date of initial incarceration. In sustaining this condition the Court remarked that "it would seem clear that the power to commute the death sentence would necessarily include the power to attach *reasonable* conditions."[50] 223 F.2d at

---

48. The American Civil Liberties Union, in their *amicus* brief filed herein by leave of court, suggests just such a condition: a condition requiring the commutee to forego supporting any candidate for political office, except the President who commuted his sentence. We fully agree that such a condition would be unenforceable and would clearly fail to meet the standards of review set forth *infra*.

49. See Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Bullock v. Carter, 405 U.S. 134, 140–141, 92 S.Ct. 849, 31 L. Ed.2d 92 (1972); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); Williams v. Rhodes, 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); NAACP v. Button, 371 U.S. 415, 438, 83 S. Ct. 328, 9 L.Ed.2d 405 (1963); Konigsberg v. State Bar of Calif., 366 U.S. 36, 49, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961). See generally Mendelson, Absolutes in the Balance, 50 Calif.L.Rev. 821 (1962).

With respect to plaintiff's Fifth Amendment challenge concerning an alleged violation of his "right to earn a livelihood," see Zwick v. Freeman, 373 F.2d 110, 118 (2 Cir. 1967), cert. denied, 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96 "the Constitution does not guarantee an unrestricted privilege to engage in business or a privilege to conduct a business as one pleases." Citing Nebbia v. New York, 291 U.S. 502, 527–528, 54 S.Ct. 505, 78 L.Ed. 940 (1934). See also De Veau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960); Bradley v. Waterfront Commission of N.Y. Harbor, 12 N.Y.2d 276, 239 N.Y.S.2d 97, 189 N.E.2d 601 (1963).

50. See also Green v. Gordon, 39 Cal.2d 230, 246 P.2d 38, 39 (1952), cert. denied 344 U.S. 886, 73 S.Ct. 187, 97 L.Ed. 686 ("validity of the conditions depends on their reasonableness"); Ex parte Collie, 38 Cal.2d 396, 240 P.2d 275 (1952) (*en banc*), cert. denied, sub nom., 345 U.S. 1000, 73 S.Ct. 1145, 97 L.Ed. 1406.

588 (emphasis added). In Lupo v. Zerbst, 92 F.2d 362 (5th Cir. 1937), the President commuted petitioner's sentence on the condition that he be law-abiding and not associate with people of "evil" character. In upholding this condition the Court noted that "[t]here is nothing illegal or against public policy in any of the conditions therein contained."[51] 92 F.2d at 364. In the state courts it has often been held that conditions attached to a pardon or commutation are valid "provided they are not unlawful, unreasonable, immoral or impossible of performance."[52] In re Charizio, 120 Vt. 208, 138 A.2d 430, 434 (1958); Baston v. Robbins, 153 Me. 128, 135 A.2d 279, 281 (1957) ("not illegal, immoral, or impossible to perform.") We find in these admittedly imprecise standards two overriding concerns in determining the lawfulness of a condition. First, there is a public policy concern, which can best be expressed in terms of the President's duty to exercise his discretion under the pardoning power in the public interest. Second, there is the concept of illegality, which in some instances may be painfully apparent, but which, for the purposes of cases like the one at bar, must also be taken to reflect the concern that a condition might unduly override the rights and liberties of the convicted person in a manner constitutionally impermissible. Based on our study of the precedents, we therefore arrive at a two-pronged test of reasonableness in determining the lawfulness of a condition: first, that the condition be directly related to the public interest; and second, that the condition not unreasonably infringe on the individual commutee's constitutional freedoms.

### (1) *Public interest considerations.*

█ In applying the first part of the test, we find that if conditions are to be attached, they must relate to the reason for the initial judgment of conviction, because it is the crime and the circumstances surrounding it that give rise to the public's interest in regulating and circumscribing the future behavior of the offender.[53] The standard we set forth in this regard is similar to that employed in examining the conditions of parole. This it seems is not mere happenstance for the concept of parole originated in part from the concept of the conditional pardon.

"Parole did not develop from any specific source or experiment but is an outgrowth of a number of independent measures: the conditional pardon, the apprenticeship by indenture, the transportation of criminals to America and Australia, the English and Irish experiences with the system of ticket-of-leave, and the work of American prison reformers during the nineteenth century."[54]

51. See also Kavalin v. White, 44 F.2d 49, 51 (10th Cir. 1930).

52. See also State ex rel. Bailey v. Mayo, 65 So.2d 721, 722 (Fla.1953); Guy v. Utecht, 216 Minn. 255, 12 N.W.2d 753, 757 (1943); Silvey v. Kaiser, 173 S.W.2d 63, 64 (Mo. 1943) (*en banc*); Huff v. Aldredge, 192 Ga. 12, 14 S.E.2d 456, 458–459 (1941); Commonwealth ex rel. Meredith v. Hall, 277 Ky. 612, 126 S.W.2d 1056, 1057 (1939); Wilborn v. Saunders, 170 Va. 153, 195 S.E. 723, 726 (1938). See *Attorney General's Survey, supra* note 5, at 198–99; Jensen, Pardoning Power in the States, *supra* note 6, at 127.

53. See pp. 1235–1236, *supra.*

54. Newman, *Sourcebook, supra* note 17, at 18.

State courts have gone so far as to hold, where the state constitution granted the governor the power to pardon, that the governor thereby had the *exclusive* power to parole and with such restrictions and limitations as the governor deemed proper. See, e. g., ex parte Ridley, 3 Okl.Cr. 350, 106 P. 549 (1910); People v. Cummings, 88 Mich. 249, 50 N.W. 310 (1891); *contra* State v. Peters, 43 Ohio St. 629, 4 N.E. 81 (Ohio 1885).

The Attorney General's survey concludes that parole was an outgrowth of the pardoning prerogative, modified by statutes such as 10 Edw. III, ch. 2 (1336) which provided that no pardon of a felony would be allowed unless the party found sureties for his good behavior. See *Attorney General's Survey, supra* note 5, at 195–96.

At least two federal courts have previously noted the analogy between conditional pardons or commutations and parole and proba-

The Attorney General's Survey also found that many states used the conditional pardon as a substitute for parole, even where parole was also available, because of the greater flexibility of the pardon.[55] "The most significant thing revealed by our examination of the various minor forms of clemency [including the conditional pardon and commutation] is the extent to which they are used to supplement or substitute for parole." [56]

■■ Under the federal system, the United States Board of Parole is empowered to release prisoners on parole where there is a "reasonable probability that such prisoner will live and remain at liberty without violating the laws" and where "such release is not incompatible with the welfare of society." 18 U.S.C. § 4203(a). In addition, the release may be "upon such terms and conditions . . . as the Board shall prescribe." The Parole Board has broad discretion in passing on parole applications [57] and may attach such conditions which are reasonably related to the valid ends of the parole system. Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Hyland v.

Procunier, 311 F.Supp. 749 (N.D.Calif. 1970). The Second Circuit in Birzon v. King, 469 F.2d 1241 (1972), in sustaining the standard condition that a parolee not associate with persons who have a criminal record, remarked:

"Although a parolee should enjoy greater freedom in many respects than a prisoner, we see no reason why the Government may not impose restrictions on the rights of the parolee that are *reasonably and necessarily related to the interests that the Government retains after his conditional release.*" (469 F.2d at 1243) (Emphasis added).

We hold that the test of the lawfulness of a condition attached to a presidential pardon or commutation is much the same.[58] The principal difference is that a condition of parole must relate to the objects of parole, whereas the President in granting a pardon or commutation has a broader discretion which encompasses a regard for protective measures in the public interest.[59]

■ Tested by this aspect of the standard of reasonableness [60] we have no

tion. See Fleenor v. Hammond, 116 F.2d 982, 986 (6th Cir. 1941); Clifton v. Beto, 298 F.Supp. 1384 (S.D.Tex.1968).

55. *Attorney General's Survey, supra* note 5, at 197.

56. *Id.* at 234.

57. See Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225, 234 (1963) *(en banc)*, cert. denied, 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed. 2d 315.

58. It is well to keep in mind that in both the parole situation and the commutation situation the respective authorities deal with individuals who stand lawfully convicted of specified crimes. See note 53, *supra,* and accompanying text. In Hyser v. Reed, *supra,* the parolee's release was conditioned on his not leaving the District of Columbia and not frequenting pool halls. The Court noted that the government could not normally limit a citizen's rights in this manner "but it can do so to Hyser [the parolee] . . . whose freedoms have been substantially abridged in accord with the requirements of due process." 318 F.2d at 239.

59. As noted above, the greater flexibility of the pardon authority is one of the reasons it is still used despite the advent of parole. See note 55, *supra,* and accompanying text.

60. The inherent reasonableness of the condition attached to plaintiff Hoffa's commutation is clearly demonstrated by the frequent appearance of similar restrictions as conditions of probation. Although probation is not a direct descendant of the pardoning power, as parole seems to be (Newman, "Beginnings of Probation," *Sourcebook, supra* note 17, at 4–16), the courts' practice in this area can be a useful guide in determining the issue of reasonableness. Under the federal probation statute the court

"when satisfied that the ends of justice and the best interest of the public as well as the defendant will be served thereby, may suspend the imposition or execution of sentence and place the defendant on probation for such period and *upon such terms and conditions as the court deems best.*" (18 U.S.C. § 3651) (Emphasis supplied).

The courts, under this broad grant of discretion, similar to that inherent in the Presi-

hesitation in upholding the condition imposed on the plaintiff Hoffa. It is clear that the crimes for which Mr. Hoffa stood convicted were directly related to his participation in union activities. The public, of course, has a strong interest in the integrity of union activities inasmuch as unions exert great influence on the economic life of the nation and on the welfare of individual members of unions. Within this context, the President was clearly justified in exacting as a condition of Hoffa's release the assurance that he would not participate directly or indirectly in the management of union activities until 1980, the time at which his judicially imposed sentences would have otherwise expired.

### (2) *Constitutional Limitations.*

 Aside from the broader public interest aspect of the reasonableness of the challenged condition, plaintiff argues that the condition is illegal as unconstitutionally infringing his First and Fifth Amendment rights. It appears, however, that most of the principal issues raised by this line of attack have previously been disposed of by the Supreme Court in De Veau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960). That case presented a

challenge to section 8 of the New York Waterfront Commission Act of 1953, which in effect disqualified any convicted felon from holding office in a waterfront labor organization. Among the charges leveled at the proscription were that the disqualification amounted to both an *ex post facto* law and a bill of attainder in violation of the Fifth Amendment. The Court specifically rejected both contentions:

"The distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt. (Citation omitted). Clearly, § 8 embodies no further implications of appellant's guilt than are contained in his 1920 judicial conviction; and so it manifestly is not a bill of attainder. The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession." (363 U.S. at 160, 80 S.Ct. at 1155).

dent's pardoning power, have imposed conditions strikingly similar to the one in question here. See, e. g., Whaley v. United States, 324 F.2d 356, 359 (9th Cir. 1963), cert. denied, 376 U.S. 911, 84 S.Ct. 665, 11 L.Ed.2d 609 (defendant, convicted of impersonating FBI agent as a ruse in connection with his occupation as an automobile repossessor, placed on probation upon condition that he not again engage in repossession business); Stone v. United States, 153 F.2d 331, 332–333 (9th Cir. 1946) (person convicted of unlawfully taking money from railroad dining cars required not to be employed as a stewart on any railroad engaged in interstate commerce during period of probation); United States v. Greenhaus, 85 F.2d 116, 117 (2d Cir. 1936) (defendant convicted of illegal sale of securities placed on probation on condition "that he behave himself well and shall not engage in any shape or form in any stock or bond sale"); see also People v. Keefer, 35 Cal.App.3d 156, 110 Cal.Rptr. 597, 605–606 (Cal.App.1973) (de-

fendant convicted of grand theft and false pretenses in connection with furnace and heating business required as condition of probation not to again engage in such business); Yarbrough v. State, 119 Ga.App. 46, 166 S.E.2d 35, 36–37 (1969) (lawyer convicted of forging deed placed on probation upon condition that he not practice law for one year); People v. Bresin, 245 Cal.App.2d 232, 53 Cal.Rptr. 687, 692 (1966) (defendant convicted of use of false pretenses in sales of aluminum siding restricted from any occupation involving sales to public); People v. Caruso, 174 Cal.App.2d 624, 345 P.2d 282, 296 (1959) (defendants, convicted of fraud, forgery and grand theft in connection with employment by automobile dealership, required to stay out of automobile business, even though they asserted it was the only business they knew). *Cf.* People v. Stanley, 162 Cal.App.2d 416, 327 P.2d 973, 976 (1958) (defendant not allowed to have telephone in his home after having been convicted of conspiring to commit bookmaking).

The condition attached to plaintiff Hoffa's commutation disqualifying him from union management is virtually identical to the type of regulation sustained in *De Veau*. The most striking difference is the fact that in *De Veau* it was the state legislature which imposed the restriction while here the restriction came about by way of executive action. We find, however, that this difference does not legally distinguish *De Veau* from the case at bar. Just as the restriction in *De Veau* was promulgated pursuant to proper legislative authority, we have found that the condition attached to Hoffa's commutation emanated from the President's explicit grant of power under Article II, Section 2 Clause One of the Constitution. To say that the President is "legislating" when he attaches a condition such as the one at issue here is simply to beg the question;[61] if the President's power includes the authority to attach conditions to pardons or commutations, the fact that the resulting condition is similar to legislatively-imposed restrictions does not make the condition a legislative act. The separation of powers doctrine has not been so stringently applied.[62] We conclude, therefore, that the constitutional principles sustaining the regulation in *De Veau* equally apply to the condition under challenge.

Plaintiff also argues that the condition unlawfully infringes on his right to free speech and association[63] and the right to pursue his chosen occupation. Although these rights are entitled to the highest degree of protection they must be applied with a view toward the particular characteristics of the circumstances which gave rise to the challenged governmental action. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 229 (1974). In the case at bar, the challenged restriction arises out of plaintiff Hoffa's previous convictions for the obstruction of justice in connection with his federal trial for violating the Taft-Hartley Act and for fraud involving misuse of moneys belonging to a Teamster's Union pension fund. Not surprisingly, the condition of Hoffa's commutation of the combined thirteen-year sentence, imposed by virtue of those convictions, requires him "not to engage in the direct or indirect management of any labor organization" until 1980.[64] As such, the condition is directed primarily at Hoffa's future "conduct" and not at pure "speech." In *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court

61. Plaintiff has also argued that the President has invaded the sentencing powers of the courts by attaching the challenged condition. But as has been shown above, the President's power to commute, i. e., to substitute one punishment for another, has been consistently held to be within the President's pardoning authority. Ironically, both parole and probation statutes have been attacked as an invasion of the pardoning power. See note 54, *supra*. See also *Nix v. James*, 7 F.2d 590 (9th Cir. 1925) (probation); *Thompson v. Duehay*, 217 F. 484 aff'd, 223 F. 305 (9th Cir. 1915) (parole).

62. Congressional delegations of quasi-legislative authority have been found violative of the separation of powers doctrine only twice in history. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

63. Plaintiffs other than Hoffa argue that their right to choose Mr. Hoffa as their rep-

resentative is also unlawfully impaired by the condition on his commutation. This issue was also raised in *De Veau* and rejected. 363 U.S. at 152, 80 S.Ct. 1146.

64. In *People v. Osslo*, 50 Cal.2d 75, 323 P.2d 397 (1958) (*en banc*), cert. denied, 357 U.S. 907, 78 S.Ct. 1152, 2 L.Ed.2d 1157, where defendants were convicted of assault and conspiracy in connection with events arising out of a union jurisdictional dispute, and defendants attacked a condition of their probation which forbade them from receiving remuneration from or holding positions in any unions, the court remarked:
"Defendants argue that the conditions of probation exceeded the trial judge's power. . . . However, since it could be and presumably was found that these defendants are guilty of crimes growing out of union activities, it appears not improper that restrictions be placed upon such activities as a condition of probation." (323 P.2d at 412–413).

noted that "when 'speech' and 'non-speech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 376, 88 S.Ct. at 1679. The Court went on to enunciate a four-part test to be applied to such restrictions:

"[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. at 1679.

As we have held above, the conditional commutation in question here is clearly within the President's power under Article II, Section 2, Clause One of the Constitution. The governmental interest served by the challenged condition is the preservation of the integrity of labor organizations and this interest has previously been recognized to be substantial. De Veau v. Braisted, *supra*. We also find that the condition by its very term is directed toward Mr. Hoffa's "management" of union activities and not intended to restrain speech as such. It is true, however, that the condition at least partially restrains plaintiff Hoffa's right of association. In this connection both the right of association and plaintiff's Fifth Amendment right to pursue his chosen occupation merge. Such restrictions which in a sense "disqualify" an individual from pursuing specified professions have been widely used and sustained in the face of constitutional challenge. De Veau v.

Braisted, *supra*, 363 U.S. at 157–159, 80 S.Ct. 1146.[65] We think it logical that if the legislature may legitimately impose such disqualifying restrictions on "all" convicted felons, no matter what the circumstances of their crime, then the President under his explicit grant of pardoning power may lawfully impose a similar restriction on a commuted felon where that felon's crime arises out of union activities and the disqualifying restriction is directed solely at such activities. Finally, the fact that the condition is directed solely at union activities satisfies the last part of the *O'Brien* test in that the "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of [the governmental] interest." As noted above, the governmental interest involved here is the protection of the integrity of labor unions. It is clear that the condition is precisely directed to the accomplishment of that objective.

Finally, plaintiff raises the question of vagueness and overbreadth. He does so with particular reference to the provision of the condition which prohibits Hoffa from engaging in "indirect" management of any labor organization. Specifically, plaintiff argues that "Hoffa cannot possibly know, nor should he bear the risk of guessing, the line marking impermissible 'indirect management'. . . ."[66] While we fully agree that the term "indirect" is of imprecise meaning, we must also recognize that the use of such terms are often necessary to include within the scope of a prohibition those activities which, though obviously within the intended purpose of a prohibition, are not amenable to easy categorization or enumeration.

"The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a

---

65. "[B]arring convicted felons from certain employments is a familiar legislative device to insure against corruption in specified, vital areas. Federal law has frequently and of old utilized this type of disqualification. (List of examples omitted). * * * State provisions disqualifying convicted felons from certain employments important to the public interest also have a long history." 363 U.S. at 158–159, 80 S.Ct. at 1154.

66. See Plaintiffs' Memorandum at 76.

constitutional dilemma the practical difficulties in drawing [in the instant case, prohibitive language] both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." Colten v. Kentucky, 407 U. S. 104, 110, 92 S.Ct. 1953, 1957, 32 L. Ed.2d 584 (1972).

In a recent challenge to § 9(a) of the Hatch Act, 5 U.S.C. § 7324(a)(2), which prohibits federal employees from taking "an active part in political management or in political campaigns," a three-judge District Court held the statutory definition of "political activity" [67] unconstitutionally vague and overbroad. In reversing the District Court, the Supreme Court remarked:

> "[T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with. . . ." (Civil Service Comm. v. National Assn. of Letter Carriers, 413 U.S. 548, 578, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973)).

Cognizant of these language limitations, and confident that the term "indirect," as used in the present context, is reasonably comprehensible in fixing the boundaries of prohibited activity, we hold that the challenged condition is not void for vagueness or overbreadth.

*5. Acceptance.*

Conceding the lawfulness of the condition, plaintiff further contends that it nevertheless cannot be enforced against him, even though he continues to enjoy the benefits of the commutation because he never "accepted" the condition. Plaintiff reasons that the remission of sentence was somehow independent of the condition and took effect automatically and irrevocably upon receipt of the warrant of clemency by the prison authorities whereas the attached condition never became effective because he never consented to it. Common sense might dictate a quick rejection of plaintiff's position but plaintiff argues that the cases mandate this seemingly anomalous result.

The uncontested facts show that Hoffa never explicitly accepted the condition attached to his commutation.[68] It is also undisputed that Hoffa has accepted, or least has never rejected, the remission of his combined thirteen-year prison sentence to six and one-half years.[69] In arguing that the condition is not binding, plaintiff relies on three Supreme Court decisions which speak of the necessity of "acceptance," United States v. Wilson, *supra,* Ex parte Wells, *supra,* and Burdick v. United States, 236 U.S. 79, 35 S.Ct. 267, 59 L.Ed. 476 (1915). We examine these cases in some detail in order to demonstrate that the requirement of "acceptance," within the pardon context, has always been a concept whereby the offeree of a pardon or commutation has the option to accept or reject *in toto* the offered clemency.[70]

---

67. The statute defined "an active part in political management or in political campaigns" as meaning those acts concerning the same which had been prohibited by determinations of the Civil Service Commission before July 19, 1940. 5 U.S.C. § 7324(a). As restated by the Commission in 1970, one of those prohibited acts included

> "directly or *indirectly* soliciting, receiving, collecting, handling, disbursing, or accounting for assessments, contributions, or other funds for a partisan political purpose." (5 C.F.R. § 733.122(b)(3)) (Emphasis added).

68. See p. 1224, *supra.*

69. *Id.*

70. For an exception to this general rule see the Court's discussion of Biddle v. Perovich, p. 1233, *supra,* where the Supreme Court ruled that the prisoner's consent was not a prerequisite to the validity of the President's commutation of his death sentence to life imprisonment. Even this exception may no longer have any application since Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), overturning the death penalty.

This position has been based on the rationale that the President should not be permitted to "force" a pardon or commutation on a convict, because the Court recognized that the act of clemency could bring with it certain unwanted consequences.

In *Wilson*, the Court was faced with the question of whether a Presidential pardon was judicially noticeable or had to be specially pleaded. The Court based its holding that the pardon had to be pleaded on the finding that a pardon was in the nature of a private deed requiring delivery and acceptance:

> "A pardon is a deed, to the validity of which delivery is essential, and delivery is not complete without acceptance. It may then be rejected by the person to whom it is tendered; and if it be rejected, we have discovered no power in a court to *force* it on him." (32 U.S. (7 Pet.) at 161). (Emphasis added).

The lower court could not simply "notice" the pardon and give it effect where the recipient specifically "waived and declined any advantage or protection" [71] which might have been provided by the pardon. In explaining the rationale of its decision the Court went on to say:

> "It may be supposed that no being condemned to death would reject a pardon; but the rule must be the same in capital cases and in misdemeanors. A pardon may be conditional, and *the condition may be more objectionable than the punishment* inflicted by the judgment." *Id.* (Emphasis added).

Thus a prisoner cannot be *forced* to accept a pardon, whether conditional or not. The pardon recipient always has the choice of rejecting the offer of clemency and suffering the consequences of the judicially imposed sentence.[72] In this sense alone is the convict's acceptance necessary.

Ex parte Wells, *supra*, further illustrates the point. The petitioner had been granted a commutation of his death sentence on condition that he be imprisoned for life. The Court expressly recognized the requirement of acceptance but within the same context as the *Wilson* Court had. The President had the power to "offer a condition" (in this case attached to the commutation of a death sentence), but no "ability to enforce [sic] its acceptance." 59 U.S. (18 How.) at 315.

> "If the condition were lawful, but the prisoner did not assent to it . . . he cannot have the benefit of the pardon—or if, having assented to it, his assent be revocable, we must consider him to have retracted it by the application to be set at liberty, in which case he is equally unable to avail himself of the pardon." [73]

It becomes clear that the notion of acceptance is an "all or nothing" proposition. Either the prisoner accepts the pardon or commutation as conditioned or he rejects it. The choice is clear and there is no in-between.

The *Burdick* case, *supra*, follows the same line of reasoning. In that case President Wilson offered a pardon to the petitioner which would have had the effect of immunizing him from any liability for incriminating statements made in the course of testifying before a federal grand jury. The petitioner had previously refused to testify concerning alleged custom fraud violations, claiming his Fifth Amendment right. After tender of the prospective pardon, Burdick

---

71. United States v. Wilson, *supra*, 32 U.S. (7 Pet.) at 158.

72. In People v. Osslo, *supra* note 64, where the court in sustaining the legality of the condition that probationers not hold any union position or receive remuneration from any union, remarked,

> "if [a defendant] feels that the terms of probation are more harsh than the sentence imposed by law [he has the right] to refuse probation and undergo such sentence." (323 P.2d at 413).

Defendants subsequently chose to do just that. In re Osslo, 51 Cal.2d 371, 334 P.2d 1 (1958) (*en banc*).

73. Ex parte Wells, *supra* at 312.

still refused to testify and was held in contempt. Upon a writ of habeas corpus, the Supreme Court reversed the contempt conviction finding that the petitioner had, in effect, rejected the offered pardon.

> "Granting, then, that the pardon was legally issued and was sufficient for immunity, it was Burdick's right to refuse it, as we have seen; and it, therefore, not becoming effective, his right under the Constitution to decline to testify remained to be asserted." (236 U.S. at 94, 35 S.Ct. at 270).

The Court explicitly rejected the government's principal argument: "[t]hat a pardon by its mere issue has automatic effect resistless by him to whom it is tendered. . . ." 236 U.S. at 90, 35 S.Ct. at 269. The pardon could be rejected because it might involve "consequences of even greater disgrace than those from which it purports to relieve." *Id.* The consequences and the pardon run together; because the prisoner might decide that no pardon would be better than a pardon under the circumstances presented, he always has the right to reject the pardon. The acceptance concept is a principle designed to protect the individual from unwanted consequences of a *forced* grant of clemency. In the case at bar there is no claim that the commutation is being forced on the plaintiff but only that the condition is; the answer is that the plaintiff Hoffa has the same right as any prisoner offered a commutation, that is, to accept the whole or reject the whole. Since the undisputed facts clearly show unequivocal conduct on the part of Hoffa reflecting his clear intent to accept the commutation despite his continuing awareness of the attached condition, he

is bound by that condition. Whether at this late date he can change his mind and reject the whole we need not now decide; but until such time as the plaintiff manifests such a desire he must be deemed to have accepted the condition of the commutation as long as he continues to accept the benefits of that commutation.[74] We conclude, therefore, that plaintiff's argument with respect to the issue of acceptance is without merit.

6. *Alleged Procedural Infirmities.*

Plaintiff has also alleged that the challenged condition was imposed without complying with the procedures for consideration of petitions for executive clemency as contained in 28 C.F.R. §§ 0.-35, 0.36, and 1.1–1.9. The undisputed facts show that the Attorney General's Letter of Advice regarding the clemency application of plaintiff Hoffa never reached the President. Instead it was received and considered by the President's advisor and counsel, John Dean. The facts also show that the Letter of Advice recommended clemency for Mr. Hoffa but did not suggest any conditions. The condition, it turns out, was apparently suggested by Mr. Dean and subsequently approved by the President.[75]

The regulations provide that the Pardon Attorney, under the supervision of the Attorney General, "shall have charge of the receipt, investigation, and disposition of applications [for executive clemency]." 28 C.F.R. § 0.35. The Pardon Attorney must then submit his recommendation to the Attorney General (28 C.F.R. § 0.36) and, after review and possible investigation, the Attorney General must advise the President as to "whether, in his judgment, the request for clemency [merits] favorable action

---

74. The Supreme Court has recently reiterated the proposition that one who accepts and retains the benefits of governmental action is also bound by any accompanying condition. Arnett v. Kennedy, 416 U.S. 134 at 152–154, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); see also Capital Ttelephone Company v. FCC, 498 F. 2d 734 at 740 (D.C.Cir. 1974) ("When an applicant accepts a government permit which is subject to certain conditions, he cannot

later assert alleged rights which the permit required him to surrender in order to receive it," citing Rome Ry. & Light Co. v. Floyd County, 243 U.S. 257, 37 S.Ct. 291, 61 L.Ed. 706 (1917); American Bond & Mortgage Co. v. United States, 52 F.2d 318, 321 (7th Cir. 1931)).

75. See pp. 1224–1225 *supra.*

by the President." 28 C.F.R. § 1.7(b). If the Attorney General makes a favorable recommendation, as he did in the case at bar, he is to "submit the petition to the President together with a warrant prepared for the signature of the President. . . ." 28 C.F.R. § 1.-7(c).

Plaintiff concedes that the President may reject the Attorney General's recommendation or may alter or modify the terms of the clemency. Nevertheless, he contends that the President must first *personally* consider the Attorney General's recommendation before acting. This proposition is based, as it must, on the assumption that the regulations governing the processing of clemency applications are somehow binding on the President and create a right in the individual applicant to demand that they be precisely complied with by the President and the Department of Justice.

The same question was at issue in Yelvington v. Presidential Pardon and Parole Attorneys, 94 U.S.App.D.C. 2, 211 F.2d 642 (1954).[76] The plaintiff there sought an order compelling the defendants to submit his petition for clemency to the President as allegedly required by the regulations. In denying plaintiff's request the court held that the regulations,

> "were primarily intended for the internal guidance of the personnel of the Department of Justice. Nothing in the regulations says that they are designed to create new and enforceable rights in persons applying for executive clemency. In fact, they imply the contrary." (211 F.2d at 643).

We fully agree with the *Yelvington* Court. The President has plenary power under the Constitution to grant pardons and reprieves. Nowhere do the regulations purport to condition the exercise of that discretion by requiring that the President first familiarize himself with the Attorney General's recommendations before he can legitimately act. We are in full agreement with the plaintiff that the regulations were intended to help rationalize the decision-making process with respect to clemency. But the rationalization of the process is just as much accomplished where one of the President's closest advisors is assigned the task of digesting the Attorney General's Letter of Advice and recommending modifications.[77] It is the President who, under his express grant of power, must in the end decide; it is the President who must execute the warrant of clemency and he is not required to seek or rely upon any other's advice in so doing. Under these circumstances the plaintiff cannot claim a right to insist upon the President personally reviewing the recommendations of the Attorney General.

Moreover, unless we are to give the regulations the very literal interpretation which the plaintiff asserts, the facts demonstrate a substantial compliance with those regulations. Hoffa's petition for clemency was received and reviewed by the Pardon Attorney and he admittedly recommended a certain disposition to the Attorney General. The Attorney General then forwarded his Letter of Advice to the President along with the applicant's petition and proposed warrant. Although the President himself did not review the case at this juncture, we find that the delegation of the preliminary task of further digesting clemency documents for the President's final attention was not beyond the contemplation of the regulations. As long as it was the President who finally decided and acted upon the clemency request, we hold that the procedural chal-

---

76. *Cf.* Silverthorne v. Laird, 460 F.2d 1175, 1186 (5th Cir. 1972); Cortright v. Resor, 447 F.2d 245, 251 (2d Cir. 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240.

77. "Obviously all the functions of his great office cannot be exercised by the President in person." United States v. Chemical Foundation, Inc., 272 U.S. 1, 13, 47 S.Ct. 1, 5, 71 L.Ed. 131 (1926).

lenge raised by the plaintiff is without merit.

■ Finally, we find plaintiff's argument that he was entitled to a due process hearing before the President could attach the challenged condition to be clearly specious. An applicant for a presidential pardon or commutation may present in his petition whatever facts and representations he deems appropriate. It is up to the President then to act on that petition as he sees fit. The President has no power to force the applicant to accept a resulting offer of pardon or commutation, whether conditional or not.[78] Under these circumstances, rights are not being involuntarily taken from the prisoner and thus the requirement of a due process hearing does not come into force. We hold, therefore, that attaching the challenged condition to the plaintiff Hoffa's commutation, without first notifying and hearing from Mr. Hoffa, did not contravene the Due Process Clause.[79]

## CONCLUSION

In sum, we hold that the condition in question was within the President's pardoning power and that under the circumstances presented the condition was reasonable and not violative of any of the plaintiff's constitutional rights. In addition, we hold that the commutation along with its condition was accepted by Mr. Hoffa within the meaning of that term as used in the context of the Reprieves and Pardons Clause. Finally, we hold that the regulations promulgated by the Justice Department concerning the procedures to be followed in seeking a pardon have been substantially complied with and that, in any event, create no enforceable statutory rights in pardon applicants. Based on the foregoing, the Court grants defendant's motion for summary judgment with respect to these issues.

An appropriate order has this day been entered.

78. See Part 5, *supra*.

79. *Cf.* Note, Executive Clemency, *supra* note 37, at 178–82.