*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LOREN J. LARSON JR., | ) |
| | )    Supreme Court No. S-17529 |
| Appellant, | ) |
| | )    Superior Court No. 3PA-18-02207 CI |
| v. | ) |
| | )    O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF CORRECTIONS, BOARD OF | )    No. 7492 – November 20, 2020 |
| PAROLE, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Loren J. Larson, Jr., pro se, Wasilla, Appellant. John H. Haley, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices.

WINFREE, Justice.

# I.     INTRODUCTION

A convicted murderer serving a lengthy prison sentence asserted that he wanted to apply for clemency from the governor on the grounds that he is innocent and was wrongfully convicted. But the applicant did not want to execute two required

information release forms that were part of the clemency application. He was advised by the Board of Parole that under the current administrative framework an incomplete application would be returned to him and not forwarded to the governor. The applicant brought suit against the Board, arguing that its refusal to forward his application without the release forms violated his due process right to submit a clemency application. He further argued that enforcing the information release requirement would violate the unconstitutional conditions doctrine, which in some contexts bars the government from conditioning a benefit on the waiver of a constitutional right. The superior court granted summary judgment to the Board, rejecting the applicant's constitutional arguments. He appeals. Because the Board did not violate the applicant's constitutional rights, we affirm the superior court's dismissal of the lawsuit.

## II.    CONSTITUTIONAL, STATUTORY, AND ADMINISTRATIVE CONTEXT

### A.    Constitutional Context

#### 1.    Constitutional history

The Alaska Constitution gives the governor broad discretionary authority to grant or deny executive clemency: "Subject to procedure prescribed by law, the governor may grant pardons, commutations, and reprieves, and may suspend and remit fines and forfeitures."[1] The Constitutional Convention record reflects the delegates' intention to give the governor this broad clemency power while also giving the legislature power to create transparency-enhancing procedures. And we have been

---

[1]    Alaska Const. art. III, § 21; *Lewis v. State, Dep't of Corr.*, 139 P.3d 1266, 1272 (Alaska 2006) ("The Alaska Constitution gives the governor broad authority to grant executive clemency.").

directed to no historical information suggesting the voters had a different intent when the Alaska Constitution was approved.[2]

During the Constitutional Convention, standing committees submitted proposed constitutional articles for the delegates' consideration.[3] Delegate Victor C. Rivers discussed the Committee on the Executive Branch's report about the executive clemency provision:

> We also handled the matter of granting reprieves, commutations, and remittance of fines and forfeitures. That is a broad clause and was adopted after much discussion in Committee. We felt that the governor would possibly be very desirous of having a pardons and parole board to sit with him and make decisions along with him in the matter of pardons, reprieves, remittances, etc., so the section has also provided for the establishment of such a commission or body to whom he may delegate certain of his powers in arriving at his pardoning decisions.[4]

Delegate Rivers later explained that during a committee meeting there had been discussion, but not adoption, of an amendment placing "certain limitations on the

---

[2] *See generally Wielechowski v. State*, 403 P.3d 1141, 1146-47 (Alaska 2017) (reviewing framework for constitutional provision interpretation, including looking to historical context, plain meaning, purpose, and framers' intent, as well as meaning voters probably placed on provision).

[3] VICTOR FISCHER, ALASKA'S CONSTITUTIONAL CONVENTION 36, 46-47, 56-59 (1975).

[4] 3 Proceedings of the Alaska Constitutional Convention (PACC) 1987 (Jan. 13, 1956). An early version of the executive clemency provision provided, in relevant part: "The governor may grant pardons, commutations, and reprieves and may suspend and remit fines and forfeitures. . . . A commission or other body may be established by law to aid and advise the governor in the exercise of executive clemency." Constitutional Convention Committee Proposal No. 10/a, § 13, Report of the Committee on the Executive Branch (Jan. 12, 1956).

pardon powers so there would be no chance of abuse."[5] Delegate Victor Fischer later questioned whether it was necessary to include from the early version of the provision a sentence stating: "A commission or other body may be established by law to aid and advise the governor in the exercise of executive clemency."[6] Delegate Rivers explained that committee members differed in opinion: "Some hold that the final responsibility for all of the pardon power should lie directly in the governor. Others believe it should be spread out in an advisory body that would temper his decisions and perhaps control any abuse of the pardoning power."[7] Delegate Rivers advocated keeping the sentence to "giv[e] the legislature the specific authority, notwithstanding the grant of the pardons power to the governor, to set up a board or commission to handle these applications and assist and aid the governor in making his decisions."[8]

The executive clemency provision was discussed again the next day, and at that time the sentence read: "The governor may grant pardons, commutations, and reprieves . . . ."[9] Delegate John M. Cross suggested adding "subject to procedure prescribed by law":

> As you will note under this section, the pardon power is the only one in this section that is not, by procedure, prescribed by law. This does not limit the governor's power. It simply gives the legislature power to prescribe a procedure that will

---

[5] 3 PACC 2014 (Jan. 13, 1956).

[6] *Id.* at 2028.

[7] *Id.*

[8] *Id.* at 2029.

[9] Constitutional Convention Committee Proposal No. 10/a, § 13, Report of the Committee on the Executive Branch (Jan. 12, 1956).

be followed in exercising this power. It is largely a matter of protecting an honest governor from pressure.[10]

Delegate Maurice T. Johnson disagreed, arguing that granting a pardon "is an individual right and it is solely for [the governor] to determine."[11] Delegate Douglas Gray similarly protested, explaining that prescribing procedures by law "may remove the individual's final chance of last resort in the case it is erroneous."[12] When asked to explain, Delegate Cross noted that he initially used "language which would limit the governor's power," but decided against doing so.[13] He expressed concern that "[a] great many pardons were made on the quiet," and he asserted that "the public is entitled to know just what happened" if the governor grants clemency.[14] Delegate Cross believed the secretive clemency decision problem "could be easily corrected if a procedure had been set up" placing the governor in the "limelight."[15]

Delegate Ralph J. Rivers agreed, noting that "without actually cutting into [the governor's] basic pardon power," he favored "open proceedings instead of an under-the-table deal . . . without the public knowing anything about it."[16] He provided an example of an open procedure, requiring filing an application with the governor or an

---

[10] 3 PACC 2190 (Jan. 14, 1956).

[11] *Id.*

[12] *Id.*

[13] *Id.* at 2191.

[14] *Id.*

[15] *Id.*

[16] *Id.*

advisory board.[17]  Following this discussion, Delegate Cross's amendment was adopted.[18]  Delegate Fischer then successfully moved to strike the sentence about the legislature's authority to establish an advisory board.[19]  He explained:  "[T]his matter is taken care of under the amendment that we have just adopted.  The legislature will have the authority to establish an advisory board."[20]

As a result of the voters' subsequent adoption and statehood's later effectuation of the Alaska Constitution,[21] article III, § 21 stands as the constitutional underpinning for broad but transparent discretionary executive clemency.

## B.    Statutory Context

In 1961 the legislature codified clemency statutes in AS 33.20.070-.080.[22] Alaska Statute 33.20.070 essentially restates the constitutional clemency provision.[23] Alaska Statute 33.20.080, setting out the governor's clemency procedure,[24] has been

---

[17]    *Id.*

[18]    *Id.* at 2192.

[19]    *Id.* at 2192-93.

[20]    *Id.* at 2192.

[21]    *See* Act of July 7, 1958, Pub. L. No. 85-508, § 1, 72 Stat. 339, 339 (providing for State of Alaska's admission into Union).

[22]    Ch. 16, §§ 1-2, SLA 1961.

[23]    *Compare* Alaska Const. art. III, § 21, *with* AS 33.20.070; *see also Lewis v. State, Dep't of Corr.*, 139 P.3d 1266, 1272 (Alaska 2006) ("Alaska Statute 33.20.070 restates the constitutional provision.").

[24]    The original statute provided that the governor "*may* refer applications for executive clemency to the Board of Parole" and that the Board "shall thereupon investigate each such case and shall submit to the [g]overnor a report of the investigation, (continued...)

amended three times to prescribe additional procedures. The statute was amended in 1989 as part of the Alaska Crime Victim's Rights Act[25] and again in 1996 as part of the Domestic Violence Prevention and Victim Protection Act.[26] And a 2007 amendment[27] "sought to prohibit governors from granting clemency without first referring the clemency application to the Board of Parole for investigation, and providing notice to victims of the offender."[28]

> The current clemency framework is found in AS 33.20.080(a) and (b):
>
> (a) The governor may not grant executive clemency to a person unless the governor has first provided notice of consideration of executive clemency to the board of parole for investigation and at least 120 days have elapsed since the notice required under (b) of this section has been provided. The board shall investigate each case and, not later than 120

---

[24]     (...continued) together with all other information the Board may have regarding the applicant." Ch. 16, § 2, SLA 1961 (emphasis added).

[25]     Ch. 59, §§ 18, 19 SLA 1989 (authorizing certain crime victims to request notification from Board of clemency applications and to provide written comments).

[26]     Ch. 64, §§ 56, 57 SLA 1996 (authorizing domestic violence crime victims to request notification from Board of clemency applications and to provide written comments).

[27]     Ch. 1, §§ 1-3, SLA 2007 (requiring governor to provide notice of clemency consideration to Board for its investigation; requiring Board to send notice of governor's consideration to Department of Law, Office of Victims' Rights, and certain victims; and requiring Board to submit report to governor within 120 days of receipt of notice of governor's clemency consideration).

[28]     Ronald S. Everett & Deborah Periman, *"The Governor's Court of Last Resort:" An Introduction to Executive Clemency in Alaska*, 28 ALASKA L. REV. 57, 89-91 (2011) (explaining that amendment followed public outrage over controversial pardon granted without input from Board or notice to deceased victim's family).

days after receipt of the notice of consideration, submit to the governor a report of the investigation, together with all other information the board has regarding the person. When the report is submitted, the board shall also transmit to the governor the comments it has received under (b) of this section.

(b) The board shall send notice of the governor's consideration of executive clemency to the Department of Law, the office of victims' rights, and the victim of a crime against a person, a crime involving domestic violence, or arson in the first degree within five business days after receipt of notice of consideration from the governor. The victim may comment in writing to the board on the consideration for executive clemency. The board shall provide notice of any action taken by the governor to the Department of Law, the office of victims' rights, and the victim.

## C. Current Administrative Context

In January 2018 then-Governor Bill Walker implemented an updated clemency application process. This process, with minor changes implemented by Governor Michael Dunleavy, is divided into four phases.

First is the initial application phase, the phase relevant to this appeal. Applications are directed to the Board, an administrative board within the Alaska Department of Corrections.[29] The Board reviews each application for completeness. An incomplete application is returned to the applicant; a complete application is forwarded to the governor, who then can either deny clemency or refer the application for investigation. Particularly relevant to this appeal, the clemency application packet includes two required information release forms, a general information release form and a medical information release form.

---

[29] *See* AS 33.16.020 (establishing Board of Parole within Department of Corrections and setting out structure of membership and terms of service).

Second is the investigation phase. If and when the governor provides statutorily required notice that clemency is being considered, the Board has 120 days to fulfill its notice and investigative duties under AS 33.20.080(a)-(b). In the third phase an advisory committee considers the application and the Board's investigative report and submits its own report to the governor with written findings and a clemency recommendation. In the fourth phase, the governor checks for conflicts of interest and makes a final clemency decision.

## III.    FACTS AND PROCEEDINGS IN THIS MATTER

### A.    Loren J. Larson, Jr. And His Lawsuit

Loren J. Larson, Jr. was convicted in 1998 of two counts of first-degree murder and one count of first-degree burglary, and he was sentenced to two consecutive 99-year terms for the murder counts and a 10-year concurrent term for the burglary count; the court of appeals affirmed Larson's conviction in 2000.[30] In 2003 the court of appeals affirmed the superior court's subsequent dismissal of Larson's post-conviction relief claim.[31] Larson maintains his innocence and has unsuccessfully challenged the convictions in numerous other proceedings.[32]

---

[30]    *Larson v. State*, No. A-07032, 2000 WL 19199, at *1-2 (Alaska App. Jan. 12, 2000); *Larson v. State*, No. A-11281, 2013 WL 4012639, at *1 (Alaska App. June 26, 2013) (listing date of conviction).

[31]    *Larson v. State*, 79 P.3d 650, 652-53 (Alaska App. 2003) (affirming dismissal of petition alleging, based on juror affidavits, wrongful conviction due to jury misconduct and bias).

[32]    *See, e.g.*, *Larson v. Turnbull*, 270 F. App'x 665, 666 (9th Cir. 2008) (affirming federal district court's dismissal of habeas corpus petition as untimely); *Larson v. State*, 254 P.3d 1073 (Alaska 2011) (affirming superior court's dismissal of civil complaint on grounds of judicial immunity and res judicata); *Larson v. State*, No. A-11281, 2013 WL 4012639, at *1 (Alaska App. June 26, 2013) (affirming superior
(continued...)

In May 2018 Larson sent the Board a letter asking whether his clemency application would be processed if he submitted it without the required information release forms. He asserted his innocence and the right to submit an initial clemency application without forfeiting his right to keep confidential information private. The Board responded that without the signed release forms an application would be considered incomplete and would not be processed.

Larson did not apply for clemency. Instead, in August 2018 Larson filed a superior court complaint, alleging that the Board was violating his due process rights by "preventing the application from reaching the [g]overnor[]." Larson requested declaratory judgment that refusal to forward to the governor a clemency application without the signed release forms constituted a due process violation and an injunction requiring that the Board accept and forward his application to the governor without the forms.

---

**32** (...continued)
court's dismissal of untimely motion for new trial); *Larson v. State*, No. A-10981, 2013 WL 6169314, at *1 (Alaska App. Nov. 20, 2013) (denying plain error claim and affirming superior court's dismissal of motion for relief from criminal judgment); *Larson v. Schmidt*, No. A-11312, 2013 WL 6576742, at *4 (Alaska App. Dec. 11, 2013) (vacating habeas corpus petition's dismissal to allow superior court consideration as post-conviction relief petition); *Larson v. State*, No. A-11835, 2016 WL 191987, at *1 (Alaska App. Jan. 13, 2016) (affirming superior court's dismissal of post-conviction relief petition); *Larson v. State*, 407 P.3d 520 (Alaska App. 2017) (concluding that petitioner was entitled to seek rehearing of court's order on merits denying his original application for relief); *Larson v. Schmidt*, No. A-12476, 2018 WL 3572449, at *1-2 (Alaska App. July 25, 2018) (denying petitioner's arguments regarding inapplicability of res judicata); *Larson v. State*, No. A-12876, 2018 WL 6200315, at *1-2 (Alaska App. Nov. 28, 2018) (affirming superior court's denial of motion to renew earlier motion for new trial).

## B. Summary Judgment Proceedings

In March 2019 Larson sought summary judgment, arguing that the Board's refusal to forward a clemency application without the release forms violated his due process rights. Citing *Lewis v. State, Department of Corrections*,[33] Larson contended that he must be given a fair opportunity to demonstrate that clemency is warranted. Larson maintained that he is innocent and was wrongfully convicted because of juror bias and that he satisfied a clemency ground. Larson argued that the Board's requirement that he submit signed release forms with his application works to "suppress" his constitutional rights, including his rights to privacy, freedom of speech, and to petition the government for redress of grievance. Larson later clarified in his reply memorandum that the Board's requirement for information releases at the initial clemency application phase violates the unconstitutional conditions doctrine by interfering with his constitutional privacy right.[34]

The Board filed a cross-motion for summary judgment, asserting that: (1) the governor has broad authority to create a clemency application and to delegate to

---

[33] 139 P.3d 1266 (Alaska 2006) (concerning clemency applicant's due process right to not be unreasonably prevented by state from submitting clemency application to present facts supporting clemency ground).

[34] "The unconstitutional condition doctrine is the principle that the government cannot condition a benefit on the requirement that a person forgo a constitutional right. The corollary is that the 'government may not deny a benefit to a person because he exercises a constitutional right.' " Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 1009 (4th ed. 2011) (citing *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 545 (1983); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . .").

the Board the task of "screening out incomplete applications"; (2) Larson's requested injunction would violate the separation of powers doctrine; and (3) requiring signed information release forms did not violate Larson's due process rights. The Board maintained that it had not prevented Larson from accessing the clemency application process and that it had not acted arbitrarily by requiring the signed release forms. The Board further argued that *Lewis* stemmed from other jurisdictions' death penalty cases and that due process should apply to clemency only if an inmate faces execution.

The superior court granted the Board summary judgment. The court determined that the "Board has properly been delegated the power to screen out incomplete applications by giving them back to the applicant instead of forwarding them to the [g]overnor." The court explained that the "Board telling Larson that his application will not be forwarded to the [g]overnor without the [information releases]" was not a due process violation. The court stated it was unnecessary to determine "whether the limited liberty interest recognized in *Lewis*" is solely applicable to death penalty cases because requiring information release forms was "not the same as interfering with Larson's access to the application process." The court concluded there was no improper government interference, emphasizing that the information releases are not an arbitrary requirement and that Larson controls whether he can submit a completed application by including the required waivers.

Larson sought reconsideration, arguing that, contrary to the court's ruling, his primary claim was that under *Lewis* he was not being afforded the opportunity to present the facts supporting his clemency ground. Larson reiterated his framing of the issue: that the Board was preventing him from making an initial showing of a potential clemency ground by requiring him to forfeit his constitutional privacy right in return for allowing him to exercise his free speech right to petition for clemency. The court denied reconsideration, explaining that it had not misconstrued Larson's argument "that he

would like to make an initial factual showing of grounds for clemency, but refuses to comply with the [information release] requirement (based on privacy grounds that this [c]ourt found to be meritless)." The court emphasized that requiring the information releases was not arbitrary and that the requirement was not the same as interfering with Larson's access to the application process.

### C. Appeal

Larson appeals, arguing that under the Alaska Constitution's due process clause[35] he must be afforded a "fair opportunity" at the initial application phase to make a factual showing that a clemency ground has been satisfied without being required to submit the signed information release forms with his clemency application. He also contends that requiring forfeiture of his privacy right at the initial application phase violates the unconstitutional conditions doctrine.

## IV. STANDARD OF REVIEW

We exercise de novo review and our independent judgment in this matter because we are reviewing the superior court's grant of summary judgment based on rulings of law on constitutional issues.[36]

## V. DISCUSSION

### A. Larson's Due Process Argument

Larson contends that under *Lewis*[37] he "has an unfettered procedural due process opportunity to make a factual showing that a ground for clemency has been

---

[35]     Alaska Const. art. I, § 7 ("No person shall be deprived of life, liberty, or property, without due process of law. The right of all persons to fair and just treatment in the course of legislative and executive investigations shall not be infringed.").

[36]     *Lewis*, 139 P.3d at 1268-69.

[37]     *Id.* at 1266.

satisfied" and that the Board must afford him a "fair opportunity" to do so without requiring information releases at the initial application phase. He contends the Board may require information release forms only after the clemency process moves beyond the initial application phase and the governor requests further investigation under phase two of the administrative process.

The Board contends that *Lewis* does not support Larson's position because the current clemency framework no longer has specified grounds for clemency and, unlike the *Lewis* applicant's allegations, the Board has not prevented Larson from gathering and presenting evidence supporting his clemency application.[38] The Board argues that clemency is a discretionary executive act and a grant of mercy rather than a right. The Board further contends that the clemency application process is not arbitrary and that the Board did not violate Larson's asserted due process rights.

In *Lewis* we considered a due process violation alleged in the then-existing clemency application process.[39] The clemency applicant had been convicted of second-degree murder and was ineligible for parole until 2011.[40] In 2002 she submitted a clemency application, in part for alleged health reasons, but the Board informed her that "it [would] not consider an application for executive clemency before an applicant

---

[38] The Board also contends that because Larson is not a capital inmate, he cannot establish a cognizable liberty interest giving rise to a due process violation. But Larson repeatedly cited *Lewis* — a non-capital case ruling that "some due process protections apply to clemency proceedings" — as supporting his due process claim, and the Board does not on appeal seek to overturn *Lewis*'s determination that clemency applicants must be afforded some limited amount of procedural due process. *Id.* at 1269. We therefore follow *Lewis*'s determination that some limited due process protects a person's interest in applying for executive clemency.

[39] *Id.* at 1267, 1269.

[40] *Id.* at 1267.

is eligible for parole except upon a 'substantial showing of innocence' or other 'exceptional circumstance arising since trial.' "[41] When she began preparing another clemency application in 2003, her attorney requested that she be examined by a doctor of her choice.[42] The Department denied the request because it saw nothing extraordinary about her medical condition warranting a deviation from its standard practice of denying requests for non-Department medical examinations.[43] The applicant filed a prison grievance, which the Department also denied.[44]

The applicant then sued the Department, challenging the grievance procedure and asserting a due process right to gather evidence for her clemency application.[45] The superior court granted the Department summary judgment.[46] The applicant appealed, asserting a due process right to gather evidence to support her clemency application.[47]

Citing federal precedent from the U.S. Supreme Court and the Eighth and Eleventh Circuit Courts of Appeal, we concluded that "[b]ecause the state allows prisoners to apply for executive clemency, it must provide applicants with some

---

[41] *Id.*

[42] *Id.*

[43] *Id.* at 1267-68.

[44] *Id.* at 1268.

[45] *Id.*

[46] *Id.*

[47] *Id.*

procedural due process during the clemency process."[48]  We explained that "[i]f a prisoner relies on a particular basis recognized by the state as a potential ground for clemency, the prisoner must have a fair opportunity to make a factual showing that the ground has been satisfied."[49]  We applied the three-factor balancing test outlined in *Mathews v. Eldridge*[50] to determine if the clemency applicant had a fair opportunity to demonstrate that her medical condition satisfied the Board's clemency eligibility criteria:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the [probable] value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative

---

[48]  *Id.* at 1269-70 & n.6 (first citing *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring)); then citing *INS v. St. Cyr*, 533 U.S. 289, 345 (2001) (Scalia, J., dissenting) ("The furthest our cases have gone in imposing due process requirements upon analogous exercises of Executive discretion is . . . . requir[ing] '*minimal* procedural safeguards' for death-penalty clemency proceedings, to prevent them from becoming so capricious as to involve 'a state official flipp[ing] a coin to determine whether to grant clemency.' " (quoting *Woodard*, 523 U.S. at 289 (emphasis and second alteration in original))); then citing *Noel v. Norris*, 336 F.3d 648, 649 (8th Cir. 2003) (holding inmate's due process rights not violated when he was not allowed to undergo special brain scan but was able to present 400-page record including evidence of brain damage supporting his clemency application); then citing *Gilreath v. State Bd. of Pardons & Paroles*, 273 F.3d 932, 934 (11th Cir. 2001) (holding in clemency context absence of one member of clemency board from oral hearing and mere appearance of impropriety did not violate due process); and then citing *Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000) (holding state official violated due process by intentionally trying to sabotage inmate's clemency application)).

[49]  *Lewis*, 139 P.3d at 1270.

[50]  424 U.S. 319, 335 (1976).

burdens that the additional or substitute procedural requirement would entail.[51]

Concerning the first and third factors, we recognized both the applicant's "significant interest in being able to generate information needed to support her clemency application" and the Department's interest "in structuring prisoners' access to medical attention."[52] Concerning the second factor, we assumed the Department's decision to deny access to a doctor of her choice might deny her access to potentially important relief,[53] but ultimately we concluded there was no due process violation because she "failed to point to any plausible indications that she had a medical condition that, if confirmed by a physician, might entitle her to clemency."[54]

Our *Lewis* decision established some limited procedural due process protections for an executive clemency applicant. We do not agree with the Board that *Lewis* is inapplicable merely because there no longer are specified clemency grounds. Alaska law allows clemency applications, and under *Lewis* an applicant still may not be unreasonably prevented from accessing the clemency process. But we agree with the Board that Larson has no viable due process claim under *Lewis*.

We first reject Larson's unsupportable contention that, because he maintains his innocence and wrongful conviction, he should be entitled to greater due process protection at the initial clemency application phase than someone who was

---

[51]     *Lewis*, 139 P.3d at 1270 (quoting *State, Dep't of Health & Soc. Servs. v. Valley Hosp. Ass'n*, 116 P.3d 580, 583 (Alaska 2005) (explaining that Alaska adopted balancing test from *Mathews* to determine whether administrative proceedings satisfy due process)).

[52]     *Id.*

[53]     *Id.*

[54]     *Id.* at 1270-72.

"fairly convicted." Larson presently stands convicted of his crimes and stands in the same shoes as any other convicted person seeking clemency from the governor.

Assuming next that Larson has a valid privacy interest that would be affected by the requirement to submit information releases at the initial phase of the clemency application process,[55] we see no risk of erroneous deprivation of this interest. Larson is not contending that requiring information releases in the clemency process is itself a due process violation. He acknowledges that information releases, "conditional or unconditional, can legitimately be demanded if the [g]overnor requests further investigation" of an application. He asserts only that requiring the information releases at the initial application phase is a due process violation. Larson has failed, however, to show how changing the timing of submitting the information releases risks erroneously depriving him of his privacy interests. And he has not explained how submitting the information releases only at the next application phase would protect his privacy interest any more than if he submitted them at the initial phase.

The Board, on the other hand, articulates sound reasons for requiring the information release forms as part of the initial application package. For example, the Board asserts that it is necessary to have the information release forms in place when the

---

[55] We are not persuaded by Larson's argument that requiring information releases at the initial phase of the application process is a per se violation of his right to privacy. "The right to privacy is not absolute" but is balanced against conflicting rights and interests. *Jones v. Jennings*, 788 P.2d 732, 738 (Alaska 1990). The clemency application is highly personal, questioning, among other things, an applicant's criminal, medical, employment, educational, and financial history; applicants further are encouraged to include personal information, such as "proof of exemplary behavior, distinct achievement, ability to act as a responsible and contributing member of society, and . . . evidence of a productive, law-abiding life." It seems unreasonable for a clemency applicant to expect a complete and unfettered right to withhold any information release form when information releases allow the Board to confirm the highly personal application's veracity.

governor asks for further investigation because there is a statutory 120-day time limit for the investigation.[56] In the same vein, the Board also argues that the administrative process is designed "to allow the governor to make rational, rather than arbitrary decisions" and that the information releases allow access to "valuable information about the applicant's medical, psychiatric, legal, employment, and educational history." And, in light of the phase two process involving investigation and notice to crime victims, the Board asserts that creating a context in which the applicant later might decline to submit the release forms could lead to unnecessary administrative burdens for the Board and unnecessary emotional burdens for crime victims.

---

[56]    *See* AS 33.20.080(a).  At oral argument before us, the Board asserted that the information release forms are used only after the governor gives notice that clemency is being considered and asks the Board to conduct its statutorily required investigation. Larson has not suggested otherwise, and we express no opinion whether the Board could use the releases for a different purpose without infringing on an applicant's constitutional rights.

We also note three things about the current medical information release form in the record.  First, it has language, apparently left over from the former administrative process for clemency applications, that does not conform with the new administrative process:  It states that the release will expire "upon final decision by the . . . Board as to whether to forward the application to the Office of the Governor."  Under the current clemency framework, the release expires just when it would be necessary for the governor's requested investigation.  At oral argument to us, the Board acknowledged the mistake in the form.  Second, although the medical information release purports to be a release under the federal Health Insurance Portability and Accountability Act of 1996, (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (codified in scattered sections of 18, 26, 29, and 42 U.S.C.), it may not be HIPAA-compliant.  *See Harrold-Jones v. Drury*, 422 P.3d 568, 570-73 (Alaska 2018) (discussing various requirements for HIPAA-compliant, voluntary medical information release form).  Finally, a person giving a HIPAA-compliant medical information release form may revoke the release at any time.  45 C.F.R. § 164.508(c)(2)(i) (2019).

We agree with the Board that requiring signed information release forms as a part of a clemency application is reasonable and not arbitrary. The requirement allows the Board to fulfill its investigative duties for the governor and is not an interference with an applicant's right to make a showing that clemency is an appropriate act by the governor.[57] And we cannot see how changing the process from requiring information release forms as a part of an application packet to requiring them only after the governor asks for an investigation would have any bearing on the governor's ultimate decision to grant or deny discretionary clemency. Accordingly, we conclude that Larson's *Lewis* due process claim has no merit and that the superior court's dismissal of that claim should be affirmed.

## B.    Larson's Unconstitutional Conditions Argument

Larson contends that requiring forfeiture of his constitutional privacy rights at the application phase of the clemency process violates the unconstitutional conditions doctrine.[58] The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."[59] It generally is immaterial that a person does not have an entitlement to a benefit; the U.S. Supreme Court has "repeatedly rejected the argument that if the government

---

[57]    *See* AS 33.20.080(a) (requiring Board to investigate executive clemency applications and, not later than 120 days after receipt of notice of governor's consideration of clemency, "submit to the governor a report of the investigation, together with all other information the board has regarding the person").

[58]    *See supra* note 34 (explaining doctrine).

[59]    *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights."[60]

The Board argues that the unconstitutional conditions doctrine is inapplicable to the clemency process by likening it to criminal and post-conviction relief proceedings, which, it contends, present a "major exception" to the unconstitutional conditions doctrine. The Board contends that in the criminal context a person may bargain away fundamental rights in exchange for plea agreements and that courts uphold those bargains under the waiver doctrine rather than under the unconstitutional conditions doctrine.[61] But the Supreme Court "has not been completely consistent in

---

[60]    *Id.* at 608; *see also* Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 HARV. L. REV. 1413, 1415 (1989) (noting doctrine provides that "government may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit altogether").

[61]    The Board cites two U.S. Supreme Court cases and a Hawaii Supreme Court case in support of its argument. *Peretz v. United States*, 501 U.S. 923, 936 (1991) (finding no constitutional infirmity in delegation of felony trial jury selection to magistrate when litigants consent, and noting that "[t]he most basic rights of criminal defendants are similarly subject to waiver"); *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969) (explaining that when a guilty plea is entered in state criminal trial defendant waives federal constitutional privilege against compulsory self-incrimination, right to trial by jury, and right to confront one's accusers); *Hawaii v. Yong Shik Won*, 372 P.3d 1065, 1086 & n.40 (Haw. 2015) (noting that Hawaii supreme court had never applied unconstitutional conditions doctrine in criminal cases); *see also* Jason Mazzone, *The Waiver Paradox*, 97 NW. U. L. REV. 801, 801-02 (2003) (explaining two doctrines that govern whether constitutional right may be waived: "doctrine of criminal waiver," allowing criminal defendants to waive various constitutional protections, and "unconstitutional conditions doctrine," generally prohibiting waiver of other constitutional rights, particularly First Amendment rights).

adhering to the unconstitutional conditions doctrine"[62] and it is "difficult to predict" the doctrine's application.[63] We have not directly addressed the doctrine.

The Sixth Circuit Court of Appeals has considered the unconstitutional conditions doctrine's application to clemency, addressing whether Ohio's clemency interview procedure imposed an unconstitutional condition on the applicant's fundamental rights.[64] Ohio's clemency interview procedure required death row inmates applying for clemency to participate in an interview without counsel and without a guarantee of immunity from further prosecution.[65] The court remanded because the district court had not addressed a potential unconstitutional condition leading "death-row inmates to make [the difficult choice] between asserting the Fifth Amendment right and participating in the clemency review process."[66] The court explained that a person with ongoing post-conviction proceedings has a "measurable interest in avoiding self-incrimination,"[67] and it also noted the apparent lack of a "compelling state interest

---

[62] Chemerinsky, *supra* note 34, at 570; *see also* Sullivan, *supra* note 60, at 1416 (noting that doctrine's application "is riven with inconsistencies").

[63] *La. Pac. Corp. v. Beazer Materials & Servs., Inc.*, 842 F. Supp. 1243, 1248 (E.D. Cal. 1994) ("[T]his court would be less than candid if it did not acknowledge that the occasions when the doctrine is applied and when it is not are difficult to predict.").

[64] *Woodard v. Ohio Adult Parole Auth.*, 107 F.3d 1178, 1188 (6th Cir. 1997), *rev'd*, 523 U.S. 272 (1998).

[65] *Id.*

[66] *Id.* at 1189.

[67] *Id.*; *cf. Graham v. Durr*, 433 P.3d 1098, 1102-04 (Alaska 2018) (discussing retention of privilege against self-incrimination in civil lawsuit while criminal appeal still pending).

in requiring waiver of Fifth Amendment rights by clemency interviewees."[68]  It then addressed potential objections to the doctrine's application, including "in instances where criminal defendants have waived constitutional rights in exchange for 'benefits,' without any resulting unconstitutional conditions problem."[69]

On later appeal to the U.S. Supreme Court the inmate again argued "that the interview unconstitutionally conditions his assertion of the right to pursue clemency on his waiver of the right to remain silent."[70]  Though acknowledging the Sixth Circuit's conclusion that the unconstitutional conditions doctrine could be applied, the Supreme Court determined it was "unnecessary to address it" in its decision.[71]  The Supreme Court reasoned that the interview procedures "d[id] not under any view violate the Fifth Amendment privilege."[72]  Questioning how an inmate's testimony at a "voluntary interview" "would be 'compelled' within the meaning of the Fifth Amendment," the Court instead characterized the issue as a matter of choice.[73]  It likened the inmate's choice between "remaining silent" or "providing information" in the interview "at the risk of damaging his case for clemency or for postconviction relief" to "the sorts of choices that a criminal defendant must make in the course of criminal proceedings, none

---

[68]  *Woodard*, 107 F.3d at 1197.

[69]  *Id.* at 1190-92.

[70]  *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 285-86 (1998).

[71]  *Id.* at 286.

[72]  *Id.*

[73]  *Id.* at 286-88.

of which has ever been held to violate the Fifth Amendment."[74] The Court thus held that Ohio's clemency proceedings did not violate the Fifth Amendment privilege against self-incrimination.[75]

A law review article by Professor Daniel Kobil supports the doctrine's application in the clemency process.[76] Kobil explains that "[i]n the clemency context, as with other unconstitutional conditions cases, it is difficult to identify with precision the conditions that would actually be invalidated by the judiciary."[77] But he asserts that courts "could properly invalidate" a condition if it "unreasonably advanced the executive's own interests" or if it "burdened a fundamental right without adequately advancing the public interest."[78]

Kobil describes a federal case involving President Richard Nixon's commutation of Jimmy Hoffa's sentence subject to the condition that he "not engage in direct or indirect management of any labor organization" until 1980.[79] After release Hoffa argued that the commutation condition violated his First Amendment rights.[80] The district court rejected his unconstitutional condition argument, but it acknowledged that

---

[74]    *Id.*

[75]    *Id.* at 288.

[76]    Daniel T. Kobil, *Compelling Mercy: Judicial Review and the Clemency Power*, 9 U. ST. THOMAS L.J. 698, 714-19 (2012).

[77]    *Id.* at 718.

[78]    *Id.* at 717-19.

[79]    *Hoffa v. Saxbe*, 378 F. Supp. 1221, 1224 (D.D.C. 1974); Kobil, *supra* note 76, at 715.

[80]    Kobil, *supra* note 76, at 715; *Hoffa*, 378 F. Supp. at 1225.

the doctrine could apply in the clemency context.[81]  Concerning the President's broad discretion in conditioning clemency, the district court recognized that a "condition which to some degree impinges on [constitutional] rights and liberties is not thereby unenforceable," but it also acknowledged that "there are obvious limits beyond which the President may not go."[82]  The court noted as an example of an unenforceable condition "requiring the commutee to forego supporting any candidate for political office, except the President who commuted his sentence."[83]  The court determined that a lawful condition must be "directly related to the public interest" and must "not unreasonably infringe on the individual commutee's constitutional freedoms."[84]  The court held the condition served the public interest and did not violate Hoffa's First Amendment rights because of the government's "substantial" interest in preserving "the integrity of labor organizations."[85]

Review of the above arguments supports the conclusion that the unconstitutional conditions doctrine could apply to the clemency process.  The Alaska Constitutional Convention minutes and the history of the executive clemency statutes suggest that there may be constitutional limits on the governor's broad discretion to grant clemency.[86]  We therefore will assume that the unconstitutional conditions doctrine can apply to Alaska's clemency process, although we do not need to decide today under

---

[81]     Kobil, *supra* note 76 at 716; *Hoffa*, 378 F. Supp. at 1234-35.

[82]     *Hoffa*, 378 F. Supp. at 1234-35.

[83]     *Id.* at 1234-35 n.48.

[84]     *Id.* at 1236.

[85]     *Id.* at 1237-38, 1240.

[86]     *See supra* pp. 2-8.

which circumstances the doctrine may apply.[87] This leaves open the question of the appropriate test to apply. Though Larson asserts that requiring the forfeiture of his privacy in the first phase of the clemency process violates the unconstitutional conditions doctrine, he does not develop a comprehensive argument in his brief or suggest the applicable test. Quoting *Burgess v. Lowery*, the Board proposes a general reasonableness test, explaining that "conditions can lawfully be imposed on the receipt of a benefit . . . provided the conditions are reasonable."[88]

The Board did not brief how we should approach determining what is "reasonable" in this context, perhaps because it presents the proposition as "well established." But there does not appear to be a uniform test.[89] For example, a Seventh

---

[87] For example, because some rights are not absolute, the unconstitutional conditions doctrine may not apply if the party asserting the claim cannot first establish the existence of a constitutional right that would be waived by the government benefit. *See Messerli v. State*, 626 P.2d 81, 83 (Alaska 1980) ("In expressing the rights to free speech and privacy, the framers of our constitution appear to have recognized a right of universal freedom and a right to be left alone . . . . But these rights, in a free society such as ours, have never been recognized as absolute and without limitations." (footnote omitted)).

[88] *Burgess v. Lowery*, 201 F.3d 942, 947 (7th Cir. 2000). In *Burgess* the father and wife of death-row inmates challenged the practice of prison officials requiring them "to submit to a strip search as a condition of being permitted to visit the inmate." *Id.* at 943. Noting that this practice "seems clearly to exceed the benefits . . . by a wide margin," the Seventh Circuit Court of Appeals determined that "a general conditioning of prison visitation on subjection to a strip search is manifestly unreasonable." *Id.* at 947-48. In a later decision, *United States v. Cranley*, the Seventh Circuit again discussed unconstitutional conditions and noted that it seemed "reasonable" to condition the option of parole on requiring a convicted criminal to answer questions by law enforcement officers concerning criminal conduct. 350 F.3d 617, 618-21 (7th Cir. 2003).

[89] *See Dolan v. City of Tigard*, 512 U.S. 374, 407 n.12 (1994) ("Although it has a long history, the 'unconstitutional conditions' doctrine has for just as long suffered

(continued...)

-26-                                                            7492

Circuit district court has explained that "[i]n determining whether a condition is reasonable, the government interest and the justification for the imposed condition must be taken into account, as well as the nature of the required sacrifice."[90] And in applying the doctrine, the Illinois Supreme Court determined a statute was unconstitutional as applied using a two-pronged test: "[F]irst, is there an essential nexus between the condition burdening rights and a legitimate state interest; and second, is there a 'rough proportionality' between the burden on the individual and the harm the government seeks to remedy through the condition."[91] On the other hand, the First Circuit Court of Appeals has applied a germaneness test, explaining that "if a condition is germane — that is, if the condition is sufficiently related to the benefit — then it may validly be imposed."[92]

---

[89]     (...continued)
from notoriously inconsistent application; it has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question." (citing *Home Ins. Co. v. Morse*, 87 U.S. 445, 451 (1874))); *La. Pac. Corp. v. Beazer Materials & Servs., Inc.*, 842 F. Supp. 1243, 1249 (E.D. Cal. 1994) (noting "the absence of a tenable theoretical base and what frequently appear to be inconsistent results renders decision-making [concerning the doctrine] an uncertain task"); *see also Gonya v. Comm'r, N.H. Ins. Dep't*, 899 A.2d 278, 284 (N.H. 2006) ("[T]he doctrine of unconstitutional conditions does not require that the same standards be applied in every case to which the doctrine applies, regardless of the nature of the constitutional right at issue.").

[90]     *Cesar v. Achim*, 542 F. Supp. 2d 897, 901-02 (E.D. Wis. 2008) (holding that "it is not an unconstitutional condition on [detainee's] right to appeal" if government prolongs detention when detainee appeals removal proceeding "because detention during removal proceedings and the removal period is constitutionally permissible").

[91]     *McElwain v. Office of Ill. Sec'y of State*, 39 N.E.3d 550, 559 (Ill. 2015) (quoting *Dolan*, 512 U.S. at 386-91).

[92]     *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 747 (1st Cir.
(continued...)

We conclude that under any articulated test, Larson's claim fails. We already have discussed the reasonableness of requiring signed information releases with the clemency application.[93] The Board has an interest in requiring clemency applicants to submit the information releases so that it can timely complete its investigation and report as required by statute. And given that (1) the releases are intended for the Board's use only in a governor-requested investigation for possible clemency, and (2) Larson does not contend that it is unconstitutional to require the information releases for that purpose,[94] the justification for the requirement outweighs any privacy sacrifice inherent in providing information release forms in the clemency application packet for the Board's contingent use in a later clemency investigation.[95]

## VI.   CONCLUSION

The superior court's dismissal of Larson' s lawsuit against the Board is AFFIRMED.

---

[92]      (...continued)
1995) (holding condition that entertainment business not operate during certain morning hours was germane to grant of license and thus was not unconstitutional condition); *see also Felkner v. R.I. Coll.*, 203 A.3d 433, 453 (R.I. 2019) (quoting *Dedham* for germaneness test); *Gonya v. Comm'r, N.H. Ins. Dep't*, 899 A.2d 278, 284, 287 (N.H. 2006) (applying germaneness test for challenge to statute conditioning benefit related to insurance claim on "release of the insured from liability up to the applicable policy limits").

[93]      *See supra* pp. 20-21.

[94]      Larson's concession is consistent with the Board's argument that a clemency applicant "has a diminished expectation of privacy in the clemency context."

[95]      We reiterate that this appeal does not present a hypothetical dispute about the Board's unauthorized use of signed information release forms.